# United States Court of Appeals
## For the First Circuit

Nos. 04-1374
    04-1390
    04-1418

LEISA YOUNG, in her capacity as Administratrix of the Estate of
Cornel Young, Jr.,

Plaintiff, Appellant, Cross-Appellee,

v.

CITY OF PROVIDENCE by and through its treasurer, Stephen
Napolitano; URBANO PRIGNANO, JR., individually and in his
official capacity as Providence Chief of Police; RICHARD
SULLIVAN, individually; JOHN RYAN, individually; and KENNETH
COHEN, individually,

Defendants, Appellees, Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,
Lynch and Lipez, Circuit Judges.

Barry Scheck, with whom Nick Brustin, Cochran Neufeld &
Scheck, LLP, David T. Goldberg, The Law Offices of David T.
Goldberg, Robert B. Mann, and Mann & Mitchell were on brief, for
plaintiff, appellant, cross-appellee Leisa Young.
Kevin F. McHugh, Assistant City Solicitor, Providence Law
Department, with whom Joseph M. Fernandez, City Solicitor,
Providence Law Department, and Caroline Cole Cornwell, Assistant
City Solicitor, Providence Law Department, were on brief, for

defendants, appellees, cross-appellants City of Providence, Urbano Prignano, Jr., and Richard Sullivan.

Michael J. Colucci, with whom Olenn & Penza, LLP was on brief, for defendants, appellees, cross-appellants John Ryan and Kenneth Cohen.

Peter T. Barbur and Cravath, Swaine, & Moore, LLP on brief for National Association of Black Law Enforcement Officers, Inc. and the Rhode Island Minority Police Association, Inc., amici curiae.

John W. Dineen and Yesser Glasson & Dineen on brief for Rhode Island Affiliate, American Civil Liberties Union, amicus curiae.

Norman J. Chachkin, Theodore M. Shaw, and Miriam Gohara on brief for NAACP Legal Defense and Educational Fund, Inc., amicus curiae.

———————————

April 11, 2005

———————————

**LYNCH**, **Circuit Judge**.   In January 2000, two on-duty Providence, Rhode Island, police officers, Michael Solitro and Carlos Saraiva, while responding to a call, shot and killed an off-duty Providence police officer, Cornel Young ("Cornel"), who was attempting to respond to the same incident under a city policy (the "always armed/always on-duty" policy) that required him to act despite being off-duty and out of uniform.   The two on-duty officers, who are white, apparently mistook Cornel, an African-American, for a threat.

Cornel's mother, Leisa Young ("Young"), filed suit in federal court, as administratrix of her son's estate, against Solitro and Saraiva for use of excessive force during the course of a seizure in violation of the Fourth Amendment to the United States Constitution; she later dismissed these officers as parties to the case but sought to hold others liable for the shooting.   Young sued the City of Providence and various Providence Police Department ("PPD") supervisors, alleging that they were responsible for Solitro's and Saraiva's underlying excessive force violation due to their deficient training, hiring, and discipline of these two officers.

After the first phase of a bifurcated trial, the jury found that Officer Solitro, but not Officer Saraiva, had violated Cornel's constitutional rights by using excessive force against him.   The district court then granted summary judgment to

-3-

Providence and the supervisors, holding that there was insufficient evidence that these defendants a) caused the underlying constitutional violation by Solitro and b) possessed the requisite level of fault (deliberate indifference) to allow the case to go to a jury. Young appealed; certain defendants cross-appealed.

After a thorough review of the evidence, we affirm the district court in part and reverse in part. The jury verdict in the first phase of the case -- finding that Solitro, but not Saraiva, violated Cornel's constitutional rights -- stands against challenges from both sides. We also affirm the district court's grant of summary judgment against Young on a claim that Providence's screening of Solitro before hiring him constituted deliberate indifference by the City to Cornel's constitutional rights (the "hiring claim"). We explain the exceptional difficulty in bringing this sort of hiring claim against the City, in light of Board of the County Commissioners of Bryan County v. Brown, 520 U.S. 397 (1997), because of the difficulty of showing a causal link between decisions to hire police officers and subsequent constitutional violations by those officers.

However, we reverse the district court's grant of summary judgment for the City on a claim that it is responsible for inadequately training Solitro on how to avoid on-duty/off-duty misidentifications in light of the department's policy that officers are always armed, and always on-duty. In Brown and City

-4-

of Canton v. Harris, 489 U.S. 378 (1989), the Supreme Court recognized that failure to train in a specific area -- such as avoiding on-duty/off-duty misidentifications of fellow officers -- may have a more demonstrable causal link to a subsequent constitutional violation by a police officer than the hiring of that officer. It is plaintiff's burden to make that demonstration. We hold that there is enough evidence that the City was deliberately indifferent in its training and lack of protocols in this area and that the training deficiencies and absence of protocols were causally linked to Solitro's use of excessive force against Young that a reasonable jury could find in Young's favor on this training and lack of protocol claim (the "training claim"). A jury could also rationally conclude in defendant's favor, but that is not the test on summary judgment. The error by the court lay in taking the case away from the jury. Finally, we remand, without discussion, claims against various supervisors to the district court for consideration in light of our disposition of the training and hiring claims against the City.

Our decision results in a remand for jury trial on Young's claim that the City violated 42 U.S.C. § 1983 by failing to adequately train Solitro on issues relating to on-duty/off-duty interactions in a manner that was both causally related to Solitro's deprivation of Cornel's constitutional rights and deliberately indifferent to those constitutional rights.

Young filed suit in federal court on June 7, 2001; an amended complaint was filed on December 16, 2002. She asserted (1) 42 U.S.C. § 1983 claims against Solitro and Saraiva for excessive force under the Fourth Amendment to the United States Constitution; (2) § 1983 claims against the City of Providence under Monell v. Department of Social Services, 436 U.S. 658 (1978), for failure to train Solitro, Saraiva, and Cornel, failure to discipline Saraiva after an earlier incident, and the hiring of Solitro;[1] (3) § 1983 supervisory liability claims against Urbano Prignano, Jr., Richard Sullivan, John Ryan, Kenneth Cohen, and Saraiva in their personal capacities; and (4) pendent state law claims against Solitro, Saraiva, Prignano, Sullivan, Ryan, Cohen, and the City of Providence. We describe later the titles and roles of each of these individual defendants.

On January 24, 2003, defendants Prignano and Sullivan moved for summary judgment on the merits of the supervisory claims against them. This initial motion was granted in part and denied in part on May 30, 2003. The district court held that Sullivan was entitled to summary judgment on claims that he inadequately

---

[1]Plaintiff also alleged a Monell claim against Urbano Prignano, Jr., in his official capacity as allegedly being final policymaker for the City; the district court considered this claim as functionally identical to the claims against the City and did not otherwise treat it. See Young v. City of Providence, 301 F. Supp. 2d 163, 173 n.12 (D.R.I. 2004). This claim has not been raised by any party on appeal and we do not discuss it.

investigated an incident involving Solitro's assault of a minority officer when hiring Solitro and that he failed to discipline Saraiva after a prior shooting. Other claims against Sullivan connected with the hiring of Solitro, however, could go forward, and hiring, training, and disciplinary claims against Prignano also survived. Regarding the training claim, the court noted that plaintiff's evidence suggested that "the department lacked policies concerning the manner in which off-duty officers were to identify themselves or to initiate action" and that "at best, only minimal off-duty response training was provided at the police academy."[2] Some additional evidence was taken between the date of this order and the subsequent final order where the district court granted summary judgment for all municipal and supervisory defendants.

Solitro and Saraiva moved for summary judgment as to the claims against them on March 12, 2003. The district court granted this motion in part and denied it in part on July 1, 2003. The court held that the excessive force claims against the two officers

---

[2]The court correctly rejected Prignano's attempt to avoid supervisory liability by stating that he was not a final, official municipal policymaker under Monell, 436 U.S. at 690 n.55, as the court noted that this was irrelevant for purposes of supervisory liability against Prignano in his personal capacity.

The court also refused to entertain Prignano and Sullivan's asserted qualified immunity defense. The court stated that Prignano and Sullivan did not make any effort to argue the various prongs of qualified immunity analysis (particularly whether the right they allegedly violated was clearly established and whether their conduct was objectively reasonable), and in truth were relying solely on the merits.

survived summary judgment, particularly given that there were factual disputes surrounding how Cornel was holding his gun and whether he verbally identified himself as an officer in Solitro and Saraiva's presence.

On August 13, 2003, Solitro and Saraiva moved for a separate trial pursuant to Fed. R. Civ. P. 42(b), seeking to have the claims against them severed from the claims against the other defendants. On September 12, 2003, the court granted Young's motion to voluntarily dismiss Solitro and Saraiva as defendants from the case, in return for Saraiva and Solitro dropping their motion to bifurcate the trial. However, the other defendants had meanwhile joined the motion for a bifurcated trial, and the court granted their motion on the same day. The court correctly interpreted the case law as stating that even without Solitro and Saraiva in the case as defendants, any liability against the City and the supervisory defendants would need to be conditioned on a finding that at least one of the officers (Solitro or Saraiva) violated Cornel's underlying constitutional right to be free of excessive force during the course of a seizure. Thus, the court ruled that the trial would proceed in two phases: phase one would determine whether Solitro and/or Saraiva had violated Cornel's constitutional rights, and, if the answer on phase one were yes for at least one of the officers, phase two would determine whether

-8-

there was any basis for holding Providence and/or the supervisory defendants liable for this constitutional violation.

Phase one of the jury trial commenced on October 8, 2003, and lasted about three weeks. Plaintiff presented testimony from Solitro and Saraiva, several civilian witnesses from the night of the shooting (January 28, 2000), and Dr. James Fyfe, an expert on police tactics, who offered expert testimony that both Solitro's leaving cover behind the police cruiser and Saraiva's failure to instruct him to maintain cover were contrary to accepted police standards in a situation like the one at issue because those actions substantially raised the risk that police officers would either be shot or would need to shoot others. Fyfe's testimony on cover was admitted over the objections of the defendants. The jury instructions included an instruction that "[i]n considering whether Solitro and/or Saraiva acted reasonably, you may . . . consider the events leading up to the shooting." On October 31, the jury returned a special verdict, finding by a preponderance of the evidence that Solitro shot Cornel in violation of the latter's constitutional rights, but that Saraiva did not do so.

As we explain in our companion opinion in Scheck v. City of Providence, No. 04-1334, issued this same day, the pro hac vice status of two members of plaintiff's three-person legal team, including lead counsel Barry Scheck, was revoked mid-trial (at the end of the day on October 17), and the third member was forced to

-9-

conduct much of the trial alone. See Young v. City of Providence, 301 F. Supp. 2d 187, 194-95 (D.R.I. 2004). At the conclusion of the trial, all three members of the team were found to have violated Fed. R. Civ. P. 11, and Scheck was publicly censured. See id. at 198-99.

At the conclusion of Young's presentation of her case and again after the close of all evidence, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50. See Young v. City of Providence, 301 F. Supp. 2d 163, 168 (D.R.I. 2004). The court heard argument on these motions on November 3, 2003, along with argument on a motion for summary judgment that had been filed by Providence, Ryan, and Cohen in June 2003 but never decided by the court and held in abeyance pending completion of phase one. See id. at 169. On November 5 (embodied in a written order dated February 11, 2004), the court denied defendants' Rule 50 motions, granted summary judgment for Providence, Ryan, and Cohen on the municipal and supervisory liability claims, and sua sponte reconsidered its May 30, 2003 order denying summary judgment and granted summary judgment to Prignano and Sullivan on the supervisory claims against those officers. See Young v. City of Providence, 301 F. Supp. 2d 163, 170 (D.R.I. 2004).[3]

_____

[3]We note that the court's February 11, 2004 written order also granted judgment on the pleadings and summary judgment in favor of defendants on all of Young's various pendant state law claims. See id. at 184-87. Young has not appealed the judgment on these state law claims to us, and any challenge to the dismissal of these state

-10-

The court held that municipal and supervisory claims based on the failure to discipline and train Saraiva must fail, given that Saraiva himself was not found to have violated Cornel's constitutional rights. See id. at 173. Moreover, the court held that any evidence that the City had failed to train Cornel to deal with off-duty situations was irrelevant, given that Cornel had no constitutional right to training. See id. at 182. The claim against Providence based on failure to train Solitro failed to survive summary judgment for three reasons: 1) there was inadequate specific evidence that the training program was deficient, 2) there was insufficient evidence of deliberate indifference, and 3) there was insufficient evidence of causation. See id. at 177-78. The court relied on the training outlined in deposition by Steven Melaragno and Robert Boehm, two officers who ran the firing range for PPD recruits, as evidence that the City did provide training on issues relating to off-duty/on-duty interactions. See id. at 176-77. The court held that the report submitted by Dr. James Fyfe, plaintiff's expert witness on police training, was unsworn, and thus should not be considered; at any rate, even if it were considered, it was merely "conclusory" and "not of sufficient evidentiary quality." Id. at 177.

The court held that the claim against Providence for deficient hiring procedures in the hiring of Solitro also failed to

law claims has been waived.

-11-

survive the high standards set out for such claims in Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397 (1997). Solitro's use of force, the court held, was not a plainly obvious consequence of his hiring as an officer. See Young, 301 F. Supp. 2d at 179-81. Finally, the supervisory claims against Ryan, Cohen, Prignano, and Sullivan failed because Young's theories of supervisory liability were factually and legally indistinguishable from her theories of municipal liability against Providence. See id. at 183-84. Although Prignano and Sullivan did not file for reconsideration of the earlier denial of summary judgment on their claims, the court sua sponte granted them summary judgment based on the factual and legally indistinguishability of the claims made against them from the claims made against Providence.[4]

Final judgment in favor of defendants entered on February 12, 2004, and Young filed her appeal on March 10. She appeals the grant of summary judgment against her on the municipal and supervisory claims that she has raised. She argues that there was

_____

[4]Young takes issue with the procedural fairness of the sua sponte grant of summary judgment in favor of Sullivan and Prignano. There are two responses. First, if this lack of notice had precluded Young from addressing all the evidence as to the liability of Sullivan and Prignano, we would be more sympathetic. But that was not the situation here. Young was on notice of Providence's motion, and had every incentive to present her best case in opposition to summary judgment. Sua sponte grants of summary judgment are allowable so long as the losing party was on notice that she had to come forward with all of her evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Second, the record is fixed and our review of that record is de novo, so there is no harm in any event.

sufficient evidence for the training claims and hiring claims against Providence and the relevant supervisory defendants to go forward to trial. She also argues that because her lead counsel was removed mid-trial, the adverse jury finding that Saraiva did not violate Cornel's constitutional rights in phase one ought be vacated. Providence, Ryan, Cohen, Prignano, and Sullivan all cross-appealed, challenging the admission of certain evidence in the phase one trial against Solitro, and asking that the jury finding that Solitro violated Cornel's constitutional rights be overturned. The individual supervisory defendants (Ryan, Cohen, Prignano, and Sullivan) also ask for qualified immunity, even should the claims against the City go forward.

**II.**

A. <u>Facts as to Phase One: The Verdict on the Underlying Excessive Force Claim</u>

We consider the evidence introduced at phase one of the trial in favor of the jury's verdict that Solitro violated Cornel's Fourth Amendment rights by using excessive force against him during the course of a seizure, and draw all inferences and resolve all credibility disputes in that direction. <u>See</u> <u>Lubetzky</u> v. <u>United States</u>, 393 F.3d 76, 79 (1st Cir. 2004).

On the early morning of January 28, 2000, at 1:43 a.m., on-duty PPD officers Solitro and Saraiva, who were on patrol in a police cruiser together, responded to a dispatch call reporting a disturbance at Fidas Restaurant in Providence. The dispatch was

-13-

for "females fighting at Fidas" and was designated a Code 2 call; Code 2 meant an "urgent" call and represented the middle range of urgency in the PPD's dispatch system, between a Code 1 call, which represented an "emergency" call and Code 3, which represented a "routine" call. Solitro was an eight-day rookie on the force; Saraiva was a three-year veteran and was informally acting as Solitro's training officer.

As the officers drove up to the restaurant in their patrol car, they saw a man (later identified as Aldrin Diaz) running towards the door of a Chevrolet Camaro, which he then entered. After the police had pulled up about 8 to 12 feet from the Camaro and while they were still in the police cruiser, Solitro and Saraiva saw Diaz pointing a gun out the window of the Camaro; Solitro then said "gun" to Saraiva. That was the only word the two officers exchanged during the entire incident. Saraiva and Solitro got out of their car; Saraiva took cover behind some poles while Solitro took cover behind the engine block and front wheel of the police cruiser. Both officers yelled commands at Diaz simultaneously: they told him to drop the gun and to get out of the car. The officers could see that Diaz no longer had the gun in his hands and was starting to get out of the car by the time that the officers saw Cornel.

Saraiva never moved from his position until the end of the incident. Solitro, after a few seconds in a position of cover

-14-

behind the cruiser, left this position of cover and walked into an open spot directly in front of the Camaro.  He stated that he did this because his cover behind the patrol car was imperfect, because he wanted to get a better look at the Camaro, because he wanted to make a rapid arrest of Diaz, and because he wanted to keep Diaz guessing.  Plaintiff's expert witness, Dr. James Fyfe, an expert on police tactics, testified that Solitro's leaving of cover was "inconsistent with accepted police practices" because it made Solitro far more vulnerable and therefore made it more likely that deadly force would have to be used by Solitro and Saraiva in order to defend Solitro.

Meanwhile, Cornel, an off-duty PPD officer, had been inside the restaurant as a customer.  Civilian witnesses located inside the restaurant testified that they saw Cornel run through the restaurant at around the time the police arrived, yelling "police, police" or "police, get out of the way" very loudly.  They saw him run through the doors of the restaurant as he continued to yell "police," and then heard him yell, "freeze."  Cornel left the restaurant within a few seconds of the arrival of Solitro and Saraiva.  A jury could easily find that Cornel was acting pursuant to the always armed/always on-duty policy of the PPD.

Diaz, the man who had dropped the gun at police command, was located outside the restaurant at the time.  He testified that he saw Cornel walk out of the restaurant holding his gun and scream

-15-

"freeze." Diaz stated that he could tell that Cornel was a police officer, from his verbal command, his body language, and his demeanor. There was then some movement by someone at the scene. Diaz stated that Cornel made a quarter turn and faced Diaz, but Cornel's gun was pointing at an angle downwards in front of Cornel and not towards Diaz or anyone else. Diaz also stated that Cornel was screaming other verbal commands during and after the quarter turn, but Diaz was not paying attention and did not understand them.

Joseph Hayman, another civilian witness located outside the restaurant who was involved in the altercation that had prompted the initial dispatch call, testified as well that he heard Cornel yell "freeze"; Hayman then turned to look at Cornel. Hayman testified that upon hearing this command, he figured the speaker was a cop, given the tone of the voice, and he responded to the command by putting his hands up. He further testified that Cornel was holding his gun with two hands, as a police officer would, rather than sideways with one hand (a technique called "gangster-style" by some of the witnesses). Hayman, like Diaz, testified that Cornel turned but never began to approach Diaz or the officers.[5]

---

[5]There were disputes of fact on virtually all of the critical points testified to by Diaz, Hayman, and the witnesses inside Fidas. For example, Solitro and Saraiva testified that they never heard Cornel say anything, and Saraiva further testified that Cornel was deliberately walking towards Diaz and Solitro and that

A witness inside Fidas testified that he heard the shots that killed Cornel being fired only "[a] second" after Cornel had left the restaurant; he referred to the timing of the shots after Cornel had left the restaurant as "instant."  Diaz testified that Cornel was shot a "couple of seconds" after he made the quarter turn.  Hayman agreed that Cornel was shot immediately after he began to turn.

Saraiva and Solitro both testified that they both yelled, simultaneously, "drop the gun" or "drop it" more than once.  It is undisputed that they never prefaced their commands with the word "police."  Then, both officers shot Cornel multiple times, killing him: Saraiva and Solitro testified that Saraiva shot first, and Solitro shot immediately thereafter.  Diaz testified:

> [The two officers were] shooting and screaming at the same time . . . .  And . . . Solitro, he's like hysterical moving. . . . [H]e was like running in place like.  His feet was moving, and he's shooting and he's like shooting with both hands, one hand.  And he's just freaking out, screaming out at the top of his head.

The jury found Solitro, but not Saraiva, to have violated Cornel's constitutional rights.

---

his gun was aimed at Diaz, not down towards the ground.  Further, Saraiva testified that Cornel was holding the gun with one hand, sideways.  These disputes of fact, of course, were for the jury to resolve.

B. <u>Facts as to Phase Two: Liability of the City and Supervisory Defendants</u>

Because phase two was decided as a pre-trial summary judgment motion filed by the defendants, we recount the facts in the light most favorable to Young, drawing all reasonable inferences in her favor.  <u>See</u> <u>Noviello</u> v. <u>City of Boston</u>, 398 F.3d 76, 81-82 (1st Cir. 2005).

<u>Structure of Authority</u>

The Providence Commissioner of Public Safety (who also headed the fire department) was the head of the PPD.  John Partington, a civilian, held that position for the relevant periods in this case.  The Commissioner is statutorily "responsible for the administration and discipline of the police department" and has

> authority to make all rules and regulations necessary for the efficiency, management and direction of the police department.  Said rules shall provide for the qualification, appointment, removal, organization, powers, duties, discipline and control of members of the police department . . . .

Providence City Charter § 1001(a).  The PPD chief of police, Urbano Prignano, Jr., during the relevant periods for this case, was appointed by the Commissioner and served at his direction.  <u>Id.</u>

<u>Lack of Specific Protocols and Training</u>

Young argues that Solitro and Saraiva's excessive force against Cornel was caused by a lack of training provided by the City and certain supervisors who have been named as defendants -- Prignano, the PPD Chief of Police at all times when Solitro,

-18-

Saraiva, and Cornel were on the force; John Ryan, the head of the training academy when Saraiva and Cornel attended it as new recruits, and Kenneth Cohen, the head of the training academy when Solitro attended it as a new recruit. Specifically, plaintiff argues that given the City's always armed/always on-duty policy, which was known to be a dangerous policy, the PPD was required to have protocols and give training on various aspects of the policy, particularly the issue of avoiding misidentification of off-duty officers.[6]

The always armed/always on-duty policy as it existed at the time of Cornel's shooting stated as follows:

> Except when on annual leave, a member shall be armed at all times while off duty . . . .
> A member shall act in his official capacity if he becomes aware of an incident which requires immediate police action and time is of the essence to safeguard life or property. While off duty, a member who takes police action . . . . shall be considered to be in an on-duty status . . . .
> Should an off-duty member become aware of an incident which requires police action, and life or property is not endangered, he shall report the incident to the appropriate . . . agency for action.

PPD Regs. §§ 202.1, 202.2. The relevant regulations further stated as follows:

> Duty status -- Although certain workday hours are allotted to every member of the force for the performance of specific workday duties, a

_____

[6]Young has made no argument that the City failed to train on issues of cover.

-19-

> member of the force shall be in an "on duty" status at all times for the preservation of the peace and the protection of life, liberty or property.  A member shall be prepared at all times and under all circumstances to perform immediately a police duty whether or not the member is in uniform or off workday duty whenever the member is cognizant of a need for police.

PPD Regs. § 201.3.

Defendants, as evidence that the PPD did provide training on off-duty/on-duty interaction issues relevant to the always armed/always on-duty policy, relied heavily on the deposition testimony of Steven Melaragno and Robert Boehm to the effect that some form of training was provided, even if not necessarily directly on the hazards of the policy.  Melaragno was in charge of firearms training at the training academy's firing range for new recruits and for current officers (who go through periodic "in service" training); Boehm worked under Melaragno at the range.  Melaragno stated that both in-service and new recruit training would include paintball "simunition" scenarios, and the goal of the training was to gauge the training officer's response whether to shoot or hold fire.  Training would include multiple scenarios, at least one of which would be a no-shoot situation: this no-shoot situation might, but need not, involve an off-duty officer as the potential target (it could also include an innocent bystander, like a store owner).

Melaragno also stated that training included a Range 2000 video simulator, which would confront officers with virtual scenarios. Officers injected into a troublesome situation (say a vehicle stop or an injured officer) would determine which commands to give and which tactics to use; if they made certain choices, shooting might be required. Melaragno was uncertain if any of the five or six Range 2000 scenarios specifically dealt with situations involving off-duty officers, although they certainly did deal with other types of no-shoot situations.[7] Partington, the Commissioner of the PPD during the relevant period, testified that in his view, Range 2000 did not specifically deal with the problem of "friendly fire" due to off-duty misidentifications.

Melaragno testified more generally that new recruits are taught that when taking action off-duty, they always need to identify themselves by displaying their badge and firearm, and calling out that they are "on the job." He testified that some of this training occurred at the firing range, but some occurred in classroom training that was provided in conjunction with firing range training. Melaragno testified initially in his deposition that this off-duty classroom training was integrated into a series

---

[7]Melaragno stated that there were some static targets a few minutes before the video scenarios began, which were used as warmup for the officers. These included plainclothes officers wearing badges along with hostile targets and bull's eyes, but Melaragno said that he "really d[id not] consider them" since they were static.

-21-

of seven lectures on officer survival (the lectures were on issues like cover). However, he testified later in the same deposition that there was a separate, eighth lecture on off-duty issues. Boehm told a grand jury investigating the Cornel shooting that officers were never "directly" taught that they needed to display their badge with their gun when taking action off-duty; this is something they would pick up "inferentially" from other training, such as the paper cutout training described below.

Boehm stated at his deposition that there were several hours of training at the academy for new recruits at a live firing range involving paper cutouts -- the officers once again had to decide whether to shoot or not. Some of these cutouts were dressed up like plainclothes officers with badges. Further, all recruits went to Camp Varnum, a training facility that was set up like a small city: recruits, who played on-duty officers, responded to fake dispatch calls where scenarios played out. Five or six of these scenarios involved off-duty officers (never played by the recruits) who were jumping out of cars quickly, moving quickly to get their badges, or running into situations where police were investigating suspicious persons. The recruits' reactions to the unexpected emergence of off-duty officers were critiqued with an instructor after each scenario had been completed.

Still, the testimony of Melaragno and Boehm was disputed. There were two themes to the factual disputes. First, the

testimony of Melaragno and Boehm as to off-duty training was not documented in any form, as might be expected had it occurred. Second, other witnesses testified that no pertinent training took place.

Both Melaragno and defendant Ryan, head of the PPD police training academy for several years, agreed that it was essential to document training, and both stated that there was, in fact, substantial documentation of other aspects of training. Melaragno stated that the training scenarios described were not documented because of an "oversight"; he admitted that this violated the basic pro-documentation policy of the academy. He also testified that documentation of classroom training on on-duty/off-duty interactions, along with other material from that piece of the curriculum (officer survival week), had simply been lost.

Further, Ryan testified at deposition inconsistently with the testimony of Melaragno and Boehm, as did other witnesses. Ryan testified that the only kind of academy training on on-duty/off-duty interactions that he knew about was his own class on civil liability training: he taught officers that because of possible exposure to liability, it was better if they did not take police action off-duty (in express contravention of the department's written policy). He emphasized that this training focused on liability concerns and did not discuss safety. He stated that he would know about any other training on off-duty issues that

occurred at the academy, except for training on internal affairs by a Sergeant Bennett (on avoiding misconduct by drinking too much off-duty, etc.) and training on firearms by Melaragno. He stated further that he would know about any "substantial training" by Melaragno on on-duty/off-duty interactions and misidentifications, and he did not know of any.

Defendant Cohen, who was head of the academy when Solitro attended, testified that he did not know one way or the other whether training on on-duty/off-duty interactions existed.

One PPD police officer, Shane Romano, recalled that there was no training on officers identifying themselves while off-duty. Another officer, Greg Small, mentioned Range 2000 training regarding off-duty altercations. Solitro, when asked whether he had any training on on-duty/off-duty identification issues, also cited some Range 2000 training that he had while at the academy. He recalled no other specific training on off-duty issues, although he agreed that "[t]here may have been some off-duty issues raised here and there in terms of questions and answers but no [specific] course on it." Saraiva recalled some training involving paper cutouts that represented off-duty officers at the range; he noted that this involved no interaction with off-duty officers.

Prignano, the PPD police chief during the relevant period, stated that in his view, off-duty officers are taught at the academy to identify themselves by showing their badge, but at

-24-

any rate, this identification protocol is "common sense," and "[you] can't teach common sense."[8]  Chief Prignano's testimony could be understood to mean that there was no pertinent training because no training was needed, as identification issues were simply a matter of common sense.

Necessity of Specific Protocols and Training

Commissioner Partington agreed with the assessment of plaintiff's expert, Dr. James Fyfe, that "off-duty encounters, and the risk they might be interrupted by on-duty police, are a well-recognized hazard of urban policing for which officers must be carefully schooled by policy and training."  He agreed with Fyfe that an always armed/always on-duty policy was inherently dangerous, and that given the department's always armed/always on-duty policy, specific training and a protocol were necessary to avoid friendly fire shootings of off-duty officers.  He further agreed with Fyfe that "[w]here such training and policy do not exist, it can be expected that off-duty officers will intervene unwisely, that on-duty officers will mistake them for suspects, and that unnecessary blood will be shed by the public and by officers."

More specifically, Commissioner Partington testified that interactions between on-duty and off-duty officers were very high stress situations, and training was needed for the very high stress

_____

[8]Despite Prignano's belief, there was evidence that certain officers did not understand that department policy required them to carry their badges with them while off-duty.

situations that officers face, since officers tend to fall back on their training in these situations. Partington agreed with Fyfe that training on off-duty/on-duty misidentification must, inter alia, "[p]rovide instruction on the risks associated with encountering other law enforcement personnel while taking off-duty action" and "[s]ensitize officers to the possibility that, while taking on-duty action, they may encounter off-duty personnel." Yet Partington testified that the only PPD training on off-duty/on-duty interactions he was aware of was that an officer should not get involved while off-duty unless a situation is life threatening (which is contrary to the language of the policy and the testimony of many other witnesses). He testified that the PPD also offered Range 2000 training, but admitted that, in his view, this did not "deal[] with the problem of friendly fire incidents."

Melaragno also emphasized the need for particularized training on on-duty/off-duty interactions. Melaragno stated similarly that on-duty/off-duty interactions were high stress situations, and even though the correct actions might seem like common sense, training was required because "under periods of high stress sometimes you need to make sure someone understands what they need to do." Melaragno further stressed the very substantial potential for tragic consequences (as in this case) if a misidentification occurs. Boehm testified that given the severity of a friendly fire incident, he knew that the department had to

-26-

train to avoid such an incident despite the lack of prior friendly fire shootings in the City.

Plaintiff presented numerous reports from police officers of past misidentifications of off-duty personnel in Providence, particularly involving minority officers, and thus, presented evidence that the department was on notice of a misidentification problem. Indeed, both Cornel and his police officer father had been the subject of misidentifications in the past. None of these earlier incidents had a violent or tragic outcome.

Plaintiff's expert, Dr. James Fyfe, wrote a report for this case based on his understanding of standard police practice and his research into other friendly fire shootings. Fyfe is the Deputy Commissioner for Training of the New York City Police Department and an authority on police tactics and training, with a doctorate in criminal justice from the State University of New York at Albany. He has reviewed more than 10,000 police shootings over the course of his career. Fyfe wrote that always armed/always on-duty policies such as the PPD policy at issue here were well-known to carry a high risk of "fatal consequences for off-duty officers," largely because "minimally competent police administrators have long recognized that there is a great distinction between officers' capacity to act forcibly while on-duty and their ability to do so off-duty." Thus, always armed/always on-duty policies "must be accompanied by training such as that described in [his research],

and that specifies a protocol designed to avoid apparent friendly fire tragedies such as occurred in this case." Absent such training, it can be expected that on-duty officers will mistake off-duty officers attempting to intervene in a situation for suspects, which will lead to unnecessary bloodshed.

There was testimony that the need to train on the always armed/always on-duty policy was heightened by the fact that there was some evidence that officers were sometimes unclear what exactly the policy required. Commissioner Partington was, before seeing the written text of the policy, under the erroneous impression that it only required action when there was a life threatening situation and that off-duty police action was only used as a last resort. And Ryan, as stated above, taught off-duty officers never to take police action, for liability reasons.

The PPD changed the always armed/always on-duty policy in 2001, after the Cornel shooting, so that officers were no longer required to carry firearms while off-duty. The new policy also clarified that off-duty officers would sufficiently fulfill their obligations under the policy by reporting an incident to police, and provided a specific protocol for any off-duty action that was taken.

Hiring

Young also argues that Providence is liable for hiring Solitro without conducting an adequate background investigation.

As well, Young asserts supervisory claims connected with this municipal claim, against both Prignano and Major Richard Sullivan (who was head of the oral hiring board, an institution described below, when Solitro was hired).

There is evidence that Solitro, who was a former employee at a juvenile detention facility, used excessive force against residents at the juvenile facility several times while attempting to restrain them, and was disciplined for this at least once. There was further evidence that he was repeatedly absent from his work, that he broke a pool table, that he ripped a phone off the wall because he was angry with a juvenile, and that the facility made Solitro see a counselor weekly for six months for anger control treatment. Solitro had also assaulted Detective Greg Small, an off-duty African-American police officer, and referred to him by using a racial slur, in the parking lot of a club in 1989; Solitro pled no contest to a simple assault charge and his record was later expunged.

A background check on Solitro was conducted by a PPD detective Oscar Perez in accordance with a standard form packet issued by the PPD; there is a written copy of these forms, filled out, in Solitro's case. The background check consisted of an interview of Solitro, his wife, his neighbors, and two supervisors at the juvenile facility. The first supervisor stated, as a response to form questions, that she found Solitro's work at the

-29-

training school satisfactory, that she would rehire him, that he was the type of person that she would like to see as a police officer in her town, and that if her son or daughter were in trouble with the authorities, Solitro was someone that she would like to have handle the case. Further, she noted that Solitro "has gained a lot of experience on this job" and "would make . . . a good police officer." Perez spoke to this supervisor for approximately 10 or 15 minutes. She also told Perez that one of Solitro's duties was to restrain juveniles; Perez may or may not have specifically asked whether he acted improperly in this role. The supervisor told about a near "riot" incident in the juvenile facility that Solitro had appropriately brought under control. She did not specifically discuss Solitro's disciplinary history with Perez: she stated later (after the shooting of Cornel) that she thought this information was confidential, that there was another way for the PPD to request it, and that therefore she could not discuss it during the interview. The PPD never requested or received a copy of Solitro's personnel file from this juvenile facility.

The second supervisor interviewed stated that Solitro was an "honest guy" who "would do a good job" as a police officer. There is evidence that one of Solitro's other supervisors, Brian Terry, who was not interviewed, was concerned about Solitro's

-30-

fitness and called an officer on the force who was his uncle to discuss the matter.

The background check was only a piece of Solitro's evaluation during the hiring process. 2,200 applicants applied for places in the 57th and 58th PPD recruit classes: only 48 recruits were selected for the 57th police academy (including Saraiva and Cornel), while only 22 officers (including Solitro) were selected for the 58th class. Solitro had to pass a written test and an agility test, and once he did so he was interviewed by a three-person oral review board, which ranked the candidates. This ranking determined the order in which candidates were admitted to the academy. Psychological testing was also performed. There is evidence that Small spoke with defendant Sullivan, the officer in charge of the oral hiring board for Solitro's academy, before Solitro was hired, and told Sullivan about the assault. Sullivan raised the issues with Solitro before the oral board.[9]

Young argues that the decision to hire Solitro was part of a pattern of inadequate screening by the PPD when hiring new officers. Several detectives who performed background checks at one time or another as part of their duties, including Perez, stated that they had no training on how to conduct them. A brief,

---

[9]Before the board, Solitro stated that he had a fight with Small but did not know that he was a police officer at the time. Sullivan believed the story partly because Solitro was charged with simple assault, rather than the more significant crime of knowingly assaulting a police officer.

three-page set of guidelines on conducting background checks was provided with the background check packets used in screening Solitro's class. There was also evidence that neither Prignano nor Sullivan received or read background checks -- Prignano stated that Sullivan, as head of the hiring board, should have brought any concerns to him after reviewing the background check in conjunction with other materials, while Sullivan said that he never saw the background investigations and did not know who considered them. Evidence existed as well that some candidates whom background investigators recommended be rejected were subsequently accepted to later academy classes without any consultation with the original background investigator who wrote the negative report.[10]

Finally, there was some evidence of generalized corruption in the PPD's hiring and promotions practices. Officers seeking promotions were allowed to cheat on certain promotional exams. Further, there is evidence that one applicant for a PPD position benefitted from a bribe: despite officials knowing that he had a series of arrests and an expunged criminal record for impersonating a police officer and being caught near his girlfriend's cabin with a rifle, the applicant was not removed from

---

[10]Many of these policies were changed after the Cornel incident. Partington and a new Chief of Police (Sullivan) instituted more thorough background investigations (particularly regarding searches for expunged criminal records), began training background investigators on how to conduct their investigations, and ensured that oral hiring boards had access to the results of background investigations.

the academy list.  Partington eventually ensured that the individual's name was removed from the list and he was never hired.[11]

**III**.

Challenges to the Phase one Verdicts

Both Young and the defendants raise challenges to the phase one jury verdicts.  Defendants challenge the verdict that Solitro violated Cornel's constitutional rights; Young challenges the verdict that Saraiva did not.  We address these challenges in turn, ultimately determining that there is no need to disturb the jury's verdicts.

1. The Defendants' Challenge to the Solitro Verdict of
   Constitutional Violation

Ryan and Cohen argue strenuously that the Solitro verdict must be overturned because of the erroneous admission of testimony that Solitro left cover, and in particular the testimony of Dr. Fyfe, which focused on assessing the propriety of Solitro's leaving cover.  This argument is incorrect; the court did not abuse its discretion in admitting this evidence.  Likewise, the court did not abuse its discretion in instructing the jury that "events leading

---

[11]Young also asserts a third set of facts as a possible basis for municipal and supervisory liability (against Prignano and Sullivan).  Plaintiff argues that the PPD's failure to discipline Saraiva after a prior incident in which he pepper sprayed a crowd and shot a civilian reflected deliberate indifference that caused Cornel's death.  But because we uphold the jury's finding that Saraiva did not violate Cornel's constitutional rights, we need not recount any of the facts about this claim.

up to the shooting" could be considered by it in determining the excessive force question.

The rule in this circuit is that once it is clear that a seizure has occurred, "the court should examine the actions of the government officials leading up to the seizure." St. Hilaire v. City of Laconia, 71 F.3d 20, 26 (1st Cir. 1995). Thus, police officers' actions for our purposes need not be examined solely at the "moment of the shooting." Id.; see also Roy v. City of Lewiston, 42 F.3d 691, 696 (1st Cir. 1994) (considering within the context of an excessive force case that the plaintiff "was armed; he apparently tried to kick and strike at the officers; he disobeyed repeated instructions to put down the weapons" as well as whether the police, tactically, should have been armed with non-lethal mace as well as guns and whether they should have "kept their distance" from the plaintiff instead of trying to subdue him at all).[12] This rule is most consistent with the Supreme Court's mandate that we consider these cases in the "totality of the circumstances."[13] Tennessee v. Garner, 471 U.S. 1, 8-9 (1985); see

[12]The various circuits have taken somewhat different positions on the question of how conduct leading up to a challenged shooting should be weighed in an excessive force case. See, e.g., Billington v. Smith, 292 F.3d 1177, 1187-88 (9th Cir. 2002) (collecting cases and explaining the different approaches). The Fourth Circuit, for example, has gone so far as to say that pre-shooting conduct is generally "not relevant and [is] inadmissible." Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991).

[13]Defendants argue that in order to make the leaving cover evidence admissible, we must segment that action out from all other

-34-

Graham v. Connor, 490 U.S. 386, 396 (1989); Abraham v. Raso, 183
F.3d 279, 291 (3d Cir. 1999). The district judge's admission of
the evidence was appropriate.

Defendants also argue that the only possible unreasonable
action by Solitro was leaving cover and that was not enough to
raise a jury question as to the objective unreasonableness of
Solitro's use of force, as a matter of law. Cf. Napier v. Town of
Windham, 187 F.3d 177, 188 (1st Cir. 1999) (fact that officers
snuck up to suspect's house did not create jury question in
excessive force case where officers unquestionably acted reasonably
in the few moments immediately surrounding the shooting). A jury

acts and determine whether there was a constitutional duty for
Solitro to maintain cover during the armed confrontation. This is
incorrect, and relies on a misreading of our precedent in St.
Hilaire and Napier v. Town of Windham, 187 F.3d 177 (1st Cir.
1999). St. Hilaire did not adopt a rigid segmentation approach
between events leading up to a shooting and the shooting itself,
but merely separated out a pre-shooting issue analytically for
purposes of qualified immunity, because of the concern for fair
notice to officers in such cases. See St. Hilaire, 187 F.3d at 27-
28.
       And Napier, which was also a qualified immunity case,
indicated only that the pre-shooting actions at issue in that case
-- the officers' creeping up to the plaintiff's house with their
guns drawn to investigate a complaint that someone had been
shooting on that property -- did not make their actions in the
moments immediately surrounding the shooting unreasonable. Napier,
187 F.3d at 188. The pre-shooting conduct at issue in Napier was
far more remote from the shooting than the conduct here. Napier
then stated that, in certain cases, pre-confrontation conduct
itself could serve as the unreasonable conduct on which a section
1983 claim could be based, if that conduct was independently
constitutionally mandated. Id. at 188-89. Napier does not hold
that events immediately leading up to a shooting cannot be
considered as part of the totality of the circumstances along with
the precise instant surrounding a shooting.

could have found, inter alia, that the officers' misidentification of Cornel by itself was unreasonable, as well as the rapidity with which they shot Cornel. The defendants' real claim is that the leaving of cover lacked a sufficient causal nexus to the shooting of Cornel to be admissible evidence -- defendants argued at trial and here that the causal relationship was simply too "remote." Such questions of proximate cause are generally best left to the jury; so here. See, e.g. Wortley v. Camplin, 333 F.3d 284, 295 (1st Cir. 2003) ("Proximate causation and intervening cause are usually issues for the jury to resolve.").

Indeed, defendants state in their briefs that they would "tend to agree" that evidence of Solitro's failure to take cover would be relevant if Diaz, and not Cornel, had been shot by the police after Diaz brandished a weapon. Here, of course, when Solitro left cover, he knew that Diaz was a threat but had not seen Cornel yet. Still, an armed confrontation had commenced, and the issue of whether Solitro's leaving cover was causally related to the shooting of Cornel was appropriately left, as the district judge did, to the jury. There was no abuse of discretion in admitting the evidence. The Solitro verdict in phase one will stand.

To the extent that the defendants make an argument that the evidence was insufficient to support a jury verdict that Solitro violated Cornel's constitutional rights by using excessive

force against him, the challenge fails.  The test for whether the use of deadly force is excessive is whether an objectively reasonable officer would believe that the suspect posed a "threat of serious physical harm either to the officer or others."  Garner, 471 U.S. at 12; see also Abraham, 183 F.3d at 289.  Most importantly, there was evidence presented at the phase one trial that Cornel was identifying himself as a police officer, was holding his gun with two hands as a police officer would, and was immediately recognized by bystanders as an off-duty officer.  We think that a jury could find that an objectively reasonable officer would have recognized Cornel as an officer, and thus would have recognized that he was not a threat and would not have shot him.  There was also evidence that Cornel's gun was pointed downwards, and not at Diaz or anyone else, and that the officers shot him extraordinarily quickly, almost immediately after he left the restaurant, and without giving him adequate warning.

2. <u>Plaintiff's Challenge to the Saraiva Verdict of No Constitutional Violation -- Pro Hac Vice Revocation</u>

Young argues that the Saraiva verdict should be vacated because two members of her legal team, including lead counsel Scheck, were removed in the middle of the phase one trial.  In the companion case <u>Scheck</u> v. <u>City of Providence</u>, No. 04-1334, issued this same day, we held that the revocation of the pro hac vice status of Young's counsel was improper and reversed, reinstating the pro hac vice status of the two lawyers.

-37-

Young argues initially that reversal of the Saraiva verdict should be automatic, and no prejudice need be demonstrated. The Supreme Court has never decided whether erroneous disqualification of chosen counsel in either criminal or civil cases automatically results in reversal of a judgment in that case, or whether harmless error analysis is employed. See Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 438 (1985); Rodriguez v. Chandler, 382 F.3d 670, 673 (7th Cir. 2004). This Circuit has held that in a criminal case, erroneous denial of the sole counsel of choice mandates reversal even absent any showing of prejudice. See United States v. Panzardi-Alvarez, 816 F.2d 813, 818 (1st Cir. 1987).[14]

The Panzardi-Alvarez rule does not, by its terms, carry over into the civil context. Panzardi-Alvarez is also factually distinguishable because here the party continued to be represented by at least one member of her chosen team of counsel and was not

---

[14]We note that Panzardi-Alvarez predates much of the Supreme Court's recent reshaping of harmless error doctrine. See, e.g., Brecht v. Abrahamson, 507 U.S. 619, 629-30 (1993); Arizona v. Fulminante, 499 U.S. 279, 306-312 (1991). Courts which have recently tackled the question of whether harmless error analysis applies when a criminal defendant has been erroneously deprived of chosen counsel have reached somewhat varying results. Compare, e.g., United States v. Gonzalez-Lopez, 399 F.3d 924 (8th Cir. 2005) (harmless error analysis inapplicable to erroneous denial of pro hac vice admission for criminal defendant's sole chosen counsel), with Chandler, 382 F.3d at 675-76 (holding that at least on collateral review, deprivation of one member of criminal defendant's chosen team of lawyers must involve prejudice in order for defendant to obtain reversal, and adopting an "adverse effect" standard).

forced to bring in new counsel.  In a criminal case, a defendant erroneously deprived of chosen counsel has suffered a Sixth Amendment violation, See Panzardi-Alvarez, 816 F.2d at 818; Kevlik v. Goldstein, 724 F.2d 844, 850 (1st Cir. 1984).  The Sixth Amendment does not apply to civil cases and therefore we have held that there is no such constitutional protection for denial of chosen counsel in a civil case.  See Kevlik, 724 F.2d at 848-49.[15] In this case, Young has not been deprived of any constitutional right through the district judge's disqualification of some of her legal team.  Counsel have been reinstated.  We will not reverse the underlying verdict, in addition to reinstating the lawyer, absent some showing of prejudice pertinent to that verdict.

We need not define the exact standard of prejudice in this case because we find it highly probable that the erroneous revocation of the pro hac vice admission of two members of Young's legal team did not affect the outcome of the verdict in favor of Saraiva.  The two lawyers who were removed continued to be available to assist the remaining lawyer, Robert Mann, and Mann continued to contact them, outside of the courtroom, because of their knowledge about the case.  Mann was considered by the

_____

[15]At least one court has held that erroneous denials of a civil litigant's chosen counsel can raise constitutional issues through the Fifth Amendment's Due Process clause.  See In re BellSouth Corp., 334 F.3d 941, 955 (11th Cir. 2003).  We think it rare, although perhaps possible, that a denial of a civil party's chosen counsel could rise to the level of a Fifth Amendment violation. Certainly there was no such violation here.

district judge to be very competent.  The local rules required Mann

-- as local counsel -- to be deeply involved in all proceedings in

the case conducted by pro hac vice counsel.  See D.R.I. Local R.

5(c)(2).  Mann was offered a continuance by the district court and

he in fact took such a continuance.  By virtue of the continuance,

the judge's desire to give Mann "leeway," and for other reasons,

there was a break of one week between the removal and the bulk of

the additional testimony.[16]  Mann noted that he had never tried a

Monell case; however, he is a highly skilled trial lawyer and he

was not trying the Monell portion of the case in phase one, but

only a relatively straightforward § 1983 excessive force case.

Moreover, the removal occurred towards the very end of

plaintiff's case in chief.  As to the defense case, Mann had

participated extensively in the depositions of defendants' fact

witnesses at the scene.  Defendants' case was quite short (a little

more than two days of testimony) and consisted almost entirely of

such fact witnesses.  Finally, we stress that Young was partially

successful -- the jury found that Solitro had violated Cornel's

constitutional rights -- and there were important differences

---

[16]Dr. Fyfe, however, testified the day after the removal.  One
of the key claims of prejudice made by the plaintiff was that Mann
was unprepared to proceed with examining Fyfe and unfamiliar with
the substance of his testimony.  But the district judge did offer
to allow Mann a continuance to prepare his examination.  Plaintiffs
declined that continuance because of Fyfe's limited availability.
Further, Fyfe's testimony focused mainly on Solitro; Solitro, of
course, was found to have violated Cornel's constitutional rights.

between the actions of Solitro and Saraiva (who was found not to have violated Cornel's rights), as Young herself points out in her reply brief to this court. Solitro left cover; Diaz's testimony about the officers' erratic behavior was directed primarily at Solitro's actions; and Solitro was closer to Cornel than Saraiva and had an unobstructed view of him because he had no cover.

The Saraiva verdict, like the Solitro verdict, is upheld.

**IV.**

A. Municipal Liability Against the City of Providence

Liability against the City of Providence is premised on Monell v. Department of Social Services, 436 U.S. 658 (1978), which held that a municipality could be liable in certain cases when its agents and employees committed constitutional violations, but not under a theory of respondeat superior. Id. at 691-95. Instead, it is only when the governmental employees' "execution of a government's policy or custom . . . inflicts the injury" and is the "moving force" behind the constitutional violation that a municipality can be liable.[17] Id. at 694.

---

[17]We quickly dispose of a preliminary argument. Defendants Ryan and Cohen argue that Young's voluntary dismissal of Solitro and Saraiva as defendants, with prejudice, acts as a judgment that Solitro and Saraiva did not violate Cornel's constitutional rights, and this in turn bars liability against Providence or the supervisors, since such liability can only be premised on an underlying constitutional violation by Solitro and Saraiva. This is without merit. Young's claim against the municipal and supervisory defendants is not an attempt to adjudicate Solitro and

-41-

Assessing liability against the City requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the City be responsible for that violation, an element which has its own components. Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).[18] The first element is satisfied here because the jury found that Solitro -- although not Saraiva -- violated Cornel's constitutional rights by using excessive force against him. The question at issue here is whether Providence is responsible for that violation. The finding that Solitro violated Cornel's constitutional rights is necessary for any finding that the City is liable, see City of Los

---

Saraiva's own rights or obtain a judgment binding on them. See, e.g., Wilson v. Town of Mendon, 294 F.3d 1, 7 (1st Cir. 2002) (individual can sue city for Monell liability without also proceeding against officers who committed underlying constitutional violation). Ryan and Cohen are therefore trying to use the voluntary dismissal of Solitro and Saraiva for issue preclusive, rather than claim preclusive, effect. While the voluntary dismissal surely had claim preclusive effect and barred any attempt to re-litigate the same claim against Solitro and Saraiva, see United States v. Cunan, 156 F.3d 110, 114 (1st Cir. 1998), it did not have any issue preclusive effect on the factual question whether Solitro and Saraiva violated Cornel's constitutional rights because this issue was never actually litigated and decided, see, e.g., Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1159 (9th Cir. 2002).

[18]The sorts of Monell claims being alleged here -- based on deficient training and hiring that helped cause the constitutional violation suffered by Cornel -- should not be confused with the kind of claim that occurs where a municipal policy itself violates federal rights or directs or authorizes the violation of those rights. See Brown v. County Comm'rs of Bryan County, 520 U.S. 397, 406-07 (1997). The standards in the latter sort of cases are quite different.

Angeles v. Heller, 475 U.S. 796, 799 (1986); Evans v. Avery, 100 F.3d 1033, 1039-40 (1st Cir. 1996), and thus causally, any basis for municipal liability must run through Solitro's actions. The actions taken by Solitro that constituted excessive force must somehow have been caused -- at least in part -- by the City's failure to train, or erroneous hiring of, Solitro. Since Saraiva did not use excessive force against Cornel, any claim hinged on the City's failure to train or discipline Saraiva must fail. For that reason, the district court correctly granted summary judgment for the City on the claim of inadequate discipline -- there is no allegation that Solitro was inadequately disciplined by Providence at any point before the shooting of Cornel.

The Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto respondeat superior, has set a very high bar for assessing municipal liability under Monell. The alleged municipal action at issue must constitute a "policy or custom" attributable to the City. See, e.g., Silva v. Worden, 130 F.3d 26, 31-32 (1st Cir. 1997). Further, the Supreme Court has imposed two additional requirements: 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as "deliberate indifference." See Brown v. County Comm'rs of Bryan County, 520 U.S. 397, 404 (1997); see also Bordanaro v.

-43-

McLeod, 871 F.2d 1151, 1161-63 (1st Cir. 1989).  Causation and deliberate indifference are separate requirements, although they are often intertwined in these cases.

We will address, in turn, Young's claims based on Providence's allegedly deficient training program and hiring procedures.

1. Training

The Supreme Court stated in City of Canton v. Harris, 489 U.S. 378 (1989), that an allegation of a local government's failure to train police officers who then violate a plaintiff's constitutional rights can be actionable where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact" and where "the identified deficiency in a city's training program [is] closely related to the ultimate injury."  Id. at 388, 391.

At the outset, we agree with the district court's reasoning that any proper allegation of failure to train must be aimed at Solitro's lack of training and not at the deficiencies in Saraiva's or Cornel's training, and must allege that Solitro's lack of training caused him to take actions that were objectively unreasonable and constituted excessive force on the night he shot Cornel.  Such a theory, when the evidence is looked at most favorably to the plaintiff, can be made out in this case: a jury could find that Solitro's shooting of Cornel was unreasonable,

inter alia, because he should have recognized Cornel as an off-duty officer (due to Cornel's demeanor and verbal commands) or not shot Cornel so rapidly without making sure of his identity. A jury could find that Solitro made such mistakes because of the PPD's lack of training on on-duty/off-duty interactions, avoiding misidentifications of off-duty officers, and other issues relating to the City's always armed/always on-duty policy. Further, a jury could find that this training deficiency constituted deliberate indifference to Cornel's rights.

We reject one argument Young has used to advance the result we do reach. The district court is correct in saying that the issue is not whether Cornel's death was caused by his own lack of proper training in identifying himself or otherwise in conducting himself while off-duty.[19] See Young, 301 F. Supp. 2d at 182. Collins establishes that a city worker has no constitutional right at all to adequate training; thus, there can be no independent claim of constitutional violation separate from Solitro's use of excessive force. See Collins, 503 U.S. at 130. While the objective reasonableness test for excessive force is not blind to the actions of the victim, the victim's actions are

---

[19]This does not necessarily mean that evidence of Cornel's and Saraiva's lack of training is irrelevant; such evidence might be relevant to show that Solitro's lack of training was part of a policy of not training on on-duty/off-duty interactions, rather than simply an "otherwise sound program [that] has occasionally been negligently administered." Canton, 489 U.S. at 391. We express no view on this question.

-45-

invariably considered from the officer's perspective and taken as given; the question is whether the officer's responses to the actions of the victim were objectively reasonable. The jury, employing this view, has found Solitro's actions unconstitutional.

We do, though, disagree with the district court's conclusion that, based on Melaragno's and Boehm's testimony, no jury could find that the training program given to officers under the policy for identification of off-duty officers was deliberately indifferent to the constitutional rights of off-duty officers like Cornel. It is true that a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing. See Canton, 489 U.S. at 391; Grazier v. City of Philadelphia, 328 F.3d 120, 125 (3d Cir. 2003); Palmquist v. Selvik, 111 F.3d 1332, 1345 (7th Cir. 1997) (where town gave police officers some training on handling suspects exhibiting abnormal behavior, argument that even more training should have been given failed).

We need not decide whether the training described by Melaragno and Boehm, if fully credited, would be sufficient to negate any possible inference of deliberate indifference, because we think the district court ignored genuine disputes of fact about whether this training ever took place. The testimony of Melaragno and Boehm may be self-serving: they may be trying to protect the

department or personally avoid blame for deficient training. That alone does not make it untrue. What calls the testimony into question is that the described training was not documented and the testimony of other witnesses is in conflict with the testimony of Melaragno and Boehm. Young presented evidence that the general policy of the PPD was to document training, and yet for unclear reasons any on-duty/off-duty training was evidently undocumented. Further, Ryan stated that he would know of any "substantial" off-duty training that Melaragno supervised. This testimony either acts to contextualize the extent of the training described by Melaragno and Boehm as a proportion of total training or creates a flat conflict with the statements of Melaragno and Boehm. Some officers recalled little or no training on on-duty/off-duty issues. Solitro recalled Range 2000 training, but Melaragno and Commissioner Partington were uncertain about the extent to which Range 2000 actually dealt with off-duty issues. Finally, Boehm and Melaragno themselves disagree about some of the training at issue. In short, there are substantial unresolved issues of fact with respect to the amount of training that the PPD actually gave to officers, including Solitro, on avoiding misidentifications of off-duty officers. The jury could find that there was, at best, very minimal training on these issues, and no real program of training on them at all.

A finding of deliberate indifference requires also that the City have disregarded a known or obvious risk of serious harm from its failure to develop a training program that dealt with off-duty identifications in the context of its always armed/always on-duty policy. We think the jury could reasonably make such a finding here. Such knowledge can be imputed to a municipality through a pattern of prior constitutional violations. See Brown, 520 U.S. at 407-08; see also Swain v. Spinney, 117 F.3d 1, 11 (1st Cir. 1997); Palmquist, 111 F.3d at 1346. Young does not rely primarily on this sort of notice, although she does have some evidence from which a jury could find that it was common knowledge within the PPD that misidentifications of off-duty officers responding to an incident often occurred in Providence, particularly misidentification of minority officers. It is clear that a jury could find a pattern of knowledge of prior misidentifications and that this was likely to pose a significant risk of harm.

We have stated that "[t]he Supreme Court has left open the possibility that a failure-to-train claim can succeed without showing a pattern of previous constitutional violations." Swain, 117 F.3d at 11 (citing Brown, 520 U.S. at 409). In fact, the Court has suggested that liability without such a pattern will be appropriate "in a narrow range of circumstances," where "a violation of [a] federal right[]" is "a highly predictable

-48-

consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Brown, 520 U.S. at 409; see Canton, 489 U.S. at 390 & n.10 ("[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms . . . . Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."); see also Allen v. Muskogee, 119 F.3d 837, 844-45 (10th Cir. 1997); Robles v. City of Fort Wayne, 113 F.3d 732, 735 (7th Cir. 1997). We think a jury could find deliberate indifference by virtue of this route here.

Although there was no evidence of a prior friendly fire shooting, a jury could find from the testimony of Commissioner Partington, Melaragno, and Boehm that the department knew that there was a high risk that absent particularized training on avoiding off-duty misidentifications, and given the department's always armed/always on-duty policy, friendly fire shootings were likely to occur. A jury could conclude that the severity of the consequences of a friendly fire shooting forced the department to take notice of the high risk despite the rarity of such an incident. Dr. Fyfe's report could lead the jury to conclude that it was common knowledge within the police community that the risk

-49-

of friendly fire shootings with an always armed/always on-duty policy was substantial, and it was also common knowledge that particularized training on on-duty/off-duty interactions (and particularly on the risk of misidentifications) was required to lessen this risk.[20] Beyond Dr. Fyfe, the statements of Commissioner Partington and Ryan could support a view that the City knew its training program to be seriously deficient. We think, in short, that the jury could find that the department knew that a friendly fire shooting in violation of the Fourth Amendment was a predictable consequence of the PPD's failure to train on on-duty/off-duty interactions, and therefore that the department was deliberately indifferent to Cornel's constitutional rights.

Defendants finally argue causation as a basis to affirm summary judgment on the training claim in their favor. The causation issue is close. The Supreme Court has stated that courts must be very careful in assessing causation and must apply a stringent standard: "the identified deficiency in a city's training program must be closely related to the ultimate injury." Canton, 489 U.S. at 391; see Brown, 520 U.S. at 409-410. As we have stated, the verdict in phase one reflects that Solitro acted in an

_____

[20]The district court declined to consider the Fyfe report on summary judgment both because it was unsworn and because it was conclusory. See Young, 301 F. Supp. 2d at 177. The report was sworn to with an affidavit, and thus that ground for disregarding the report was error. The aspects of the report on which we rely could properly have been testified to by Fyfe.

objectively unreasonable fashion for an officer.  The jury could conclude that Solitro was not trained by the PPD to know that there could be off-duty officers at a scene, responding to the same incidents, whom on-duty officers must take pains to identify.  A jury could find that training would have made a difference here, unlike in other situations where it would have been unlikely to stop unconstitutional conduct.  See, e.g., Barney v. Pulsipher, 143 F.3d 1299, 1308 (10th Cir. 1998) (training claim failed because training would be unlikely to stop jailer from sexually assaulting inmates); Robles, 113 F.3d at 736.

The testimony of Commissioner Partington and Melarango establishes that even though identification of off-duty officers might appear to be a matter of common sense, in situations of high stress such as where an officer is evaluating the threat level of an unknown individual armed with a gun, officers tend to fall back on their training.  They could find that if Solitro had, for example, been instructed that he was likely to encounter off-duty police officers while on-duty himself, had seen many situations involving off-duty officers in range and scenario training, and had been instructed on the kinds of actions that off-duty officers would take to attempt to identify themselves, then he would have properly recognized Cornel as an off-duty officer and would not have shot him.

-51-

We reverse the grant of summary judgment against Young on the failure to train claim. We remand this claim for trial.[21]

2. Hiring

It is much harder for a Monell plaintiff to succeed on a hiring claim than a failure to train claim. See Brown, 520 U.S. at 409 ("The proffered analogy between failure-to-train cases and

_____

[21]Providence makes several confusing arguments based on the undisputed requirement under Monell that a municipal policy or custom be involved in order to make a municipality liable. See, e.g., Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989); City of St. Louis v. Praprotnik, 485 U.S. 112, 123-25 (1988) (plurality opinion); Pembaur v. City of Cincinnati, 475 U.S. 469, 481-83 (1986); Baron v. Suffolk County Sheriff's Dept., No. 03-2718, 2005 WL 708338, at 11-13 (1st Cir. March 29, 2005). Providence does not dispute that the jury could find that the always armed/always on-duty requirement is a policy of the City promulgated by an official policymaker. A jury could further find that this policy poses substantial risks of harm which are inherent but which risks could be minimized by proper training. A jury could also conclude from the testimony of Commissioner Partington that there was a Providence policy or custom of not training PPD officers on the inherent risks of the always armed/always on-duty policy (and how to avoid them) in a way that was deliberately indifferent and caused the violation of Cornel's constitutional rights. And although it is unclear whether Chief Prignano was a final policymaker for the municipality on PPD training issues, Commissioner Partington clearly was such a final policymaker: as Commissioner of Public Safety he had been delegated broad policymaking authority over PPD procedures by the municipality.

We again leave for another day the question left open in Baron, which is whether a court in a Monell case involving an allegation of a culpable "custom" -- not policy -- must explicitly link that custom to a final policymaker in order to make a municipality liable. See Baron, 2005 WL 708338, at *12-13 (allegation of culpable municipal policy requires that court explicitly find a final policymaker, but it is unclear whether final policymaker must be explicitly identified in a custom case). In this case, a jury could find either a policy or custom of failure to train on the risks of the always armed/always on-duty policy; the jury could also attribute either the policy or custom to Commissioner Partington.

-52-

inadequate screening cases is not persuasive."). This is because it is especially difficult, with a hiring claim, to find both causation (that the hiring decision caused the constitutional deprivation of the plaintiff in a particularized sense) and fault (that the hiring decision reflected deliberate indifference to the particular constitutional right at issue of the plaintiff). See, e.g., Barney, 143 F.3d at 1308. Further, hiring claims are especially likely to collapse into a species of respondeat superior liability, if not checked by particularly stringent standards. See Brown, 520 U.S. at 410.

The Supreme Court has stated that it is unclear whether a single hiring decision due to inadequate screening can ever lead to Monell liability. Id. at 412. If it can, however, the plaintiff would need to show that, if the City had performed a full review of the hired officer's record, the particular constitutional violation committed by the hired officer would have been a "plainly obvious consequence" of the hiring decision by the municipality. Id. at 412-13; see also Morris v. Crawford County, 299 F.3d 919, 924-25 (8th Cir. 2002); Gros v. City of Grand Prairie, 209 F.3d 431, 435 (5th Cir. 2000); Barney, 143 F.3d at 1308-09. This standard is exceptionally stringent. Solitro's record included several complaints of excessive force while restraining juveniles, and he had an expunged conviction for assaulting Small, an off-duty minority officer. But "even when an applicant's background

contains complaints of physical violence, including acts of aggression and assault," this may still be insufficient to make a City liable for inadequate screening of an officer who then uses excessive force. See Morris, 299 F.3d at 924; see also Brown, 520 U.S. at 413-14 (officer's record insufficiently related to excessive force complaint even where it included a conviction for assault and battery).

At any rate, we need not decide this issue on which the City so heavily relies. Although Brown itself is focused on the "actual background of the individual applicant," it cannot be that the "thoroughness or adequacy of the municipality's review of the application" is irrelevant. See Barney, 143 F.3d at 1308 n.7. The procedures involved in the review of Solitro's application, on the undisputed facts, were not sufficiently inadequate to raise a jury question as to Providence's deliberate indifference. A background check was performed, the background investigator spoke to two of Solitro's supervisors at the juvenile facility and received good reviews, and the Small incident came to light and was discussed at Solitro's oral interview before the hiring board. That procedures were flawed does not make Providence deliberately indifferent to the risk that Solitro would use excessive force.

Finally, Young attempts to remove her hiring claim from the ambit of the "single incident" facts discussed in Brown by stating that here, the PPD's hiring procedures were generally

deficient. She points to evidence that background investigators were untrained, that background checks were not received by the members of the oral board, and that background checks were ignored by the policymakers. She also points to evidence of one violent individual whose name kept coming up on the applicant list due to corruption, but who was never actually hired. Given the logic of Brown, this is not the sort of hiring pattern that could lead to an inference of deliberate indifference.[22] See Synder v. Trepagnier, 142 F.3d 791, 796 (5th Cir. 1998) (analyzing hiring claim as a single incident case under Brown despite allegation that "the City's hiring policies were [generally] deficient because candidates' backgrounds were inadequately investigated."). A pattern of previous bad hiring decisions leading to constitutional violations (perhaps of the same type as the one at issue) would likely be necessary to get one outside the "single incident" analysis in Brown. See Brown, 520 U.S. at 409-11.

We affirm summary judgment for the City on Young's deficient hiring claim. The recent trend of Supreme Court cases, which use very particularized notions of causation and fault, make

---

[22]We note, as well, that many of the general deficiencies in hiring procedures that Young points to have no causal relationship to the hiring of Solitro, and they thus have no causal relationship to the shooting of Cornel. It made no difference to Solitro that background checks were not seen by the oral board, for the background check on Solitro contained no disqualifying information. Likewise, the fact that negative background checks were ignored has no causal relationship to Solitro's hiring, again because his background check did not uncover any problems.

it unlikely that the training claim and the hiring claim could be combined into one mishmash, despite the hiring claim's inability to survive on its own, and given to the jury. See, e.g., Brown, 520 U.S. at 406-07. Even if, in some cases, it might be appropriate to combine the two claims, see Bordanaro v. McLeod, 871 F.2d 1151, 1159 (1st Cir. 1989) (combining Monell claims that city had inadequate "recruitment, training, supervision and discipline" of its police force), this is not such a case. Throughout the proceedings below and here (save for a brief mention at oral argument), Young has argued the training, hiring, and discipline points separately.

B. Supervisory Liability and Qualified Immunity

Young asserts claims against Prignano, Sullivan, Ryan, and Cohen for supervisory liability. See, e.g., Camilo-Robles v. Hoyos, 151 F.3d 1, 6-7 (1st Cir. 1998); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581-82 (1st Cir. 1994). These individual defendants ask that the summary judgment granted in their favor be affirmed. We decline to do so. The issues are better addressed by the district court.

We have reversed entry of summary judgment against Providence on the failure to train claim, a consideration pertinent to qualified immunity analysis. The district court never dealt with qualified immunity issues -- it made no rulings on the second prong of qualified immunity analysis, whether both the underlying

-56-

constitutional violation of Solitro and the basis for liability of the various supervisors were clearly established, nor did it make any rulings on the third prong, whether the supervisors' actions were otherwise objectively reasonable.[23]  See Camilo-Robles, 151 F.3d at 6-8.  Further, the record on qualified immunity issues is not well developed and the briefing on appeal is inadequate.  Thus, the most prudent course is to vacate the grant of summary judgment in favor of the four supervisory defendants, premised on the erroneous grant of summary judgment to Providence, and remand.  We do not address the issue of supervisory liability here.

**V.**

The phase one verdict that Solitro violated Cornel's constitutional rights while Saraiva did not is **affirmed**.  On phase two, the grant of summary judgment in Providence's favor on Young's § 1983 failure to train claim based on the training of Solitro is **reversed**, and that claim is **remanded** for trial.  The grants of summary judgment in favor of Providence on all other § 1983 claims against it -- based on Saraiva and Cornel's training, Solitro's hiring, and Saraiva's discipline -- are **affirmed**.  The grants of

------

[23]In its May 30, 2003 ruling on Sullivan and Prignano's initial motion for summary judgment, the district court held that the two, in their motion, never raised any qualified immunity issues that went beyond the merits of the case; in its February 11, 2004 ruling on Ryan, Cohen, and Providence's subsequent motion for summary judgment, the district court did not reach qualified immunity because it held that the disposition of the claims against Providence effectively disposed of the supervisory claims -- on the merits -- as well.  Young, 301 F. Supp. 2d at 183-84.

summary judgment against Young on the § 1983 supervisory claims against Prignano, Sullivan, Ryan, and Cohen are **<u>vacated</u>** and **<u>remanded</u>** to the district court. The case is **<u>remanded</u>** for proceedings consistent with this opinion.[24]

---

[24]Young challenges various discovery orders made by the district court refusing requests for (1) records concerning misidentification of officers by civilians or other officers, (2) arrest and incident reports reflecting PPD officers taking off-duty action, (3) discipline records concerning off-duty conduct of PPD officers, and (4) data and statistics on racial profiling. We see no abuse of discretion in the denial of these discovery requests. The third and fourth items are irrelevant given Young's legal theory. <u>See</u> Fed. R. Civ. P. 26(b)(1). While some of the information in the first and second items could have relevance to this case, the sweeping breadth in the way these requests were framed adequately justified denial. <u>See</u> Fed. R. Civ. P. 26(b)(2). Young also challenges orders declining a request to make former Providence Mayor Cianci give more specific answers to deposition questions and declining to force the current PPD chief to be deposed at all. There was no abuse of discretion here either; neither witness is relevant to Young's case.

Young also challenges a denial of her motion to amend the complaint to add a supervisory claim against Ryan for his involvement in the hiring process. This challenge is moot, given that we have affirmed summary judgment against Young on her claim that Providence was liable for deficient hiring; Young has put forth no separate theory that would lead to supervisory liability against Ryan based on hiring.

Young never asks us to rule on whether the district court's use of a local rule, D.R.I. Am. Gen. Order 2002-01, to limit the total length of legal memoranda to 10 pages for most motions and 20 pages for motions for summary judgment, and to limit the length of supporting appendices and exhibits submitted with those memoranda by use of the same (10 and 20) page restrictions, was appropriate. We do not reach this question.