# United States Court of Appeals
## For the First Circuit

No. 18-2015

DAMARIS JUSTINIANO,
as the personal representative of the Estate of Wilfredo
Justiniano, Jr.,

Plaintiff, Appellant,

v.

STEPHEN V. WALKER; TIMOTHY P. ALBEN,

Defendants, Appellees.

No. 20-1063

DAMARIS JUSTINIANO,
as the personal representative of the Estate of Wilfredo
Justiniano, Jr.,

Plaintiff, Appellant,

v.

STEPHEN V. WALKER,

Defendant, Appellee,

TIMOTHY P. ALBEN,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]
[Hon. Donald L. Cabell, U.S. Magistrate Judge]

Before

Thompson, Selya, and Barron,
Circuit Judges.

Jin-Ho King, with whom Ilyas J. Rona and Milligan Rona Duran & King LLC were on brief, for appellant.
David J. Officer, with whom David J. Officer, P.C. was on brief, for appellee Stephen V. Walker.
Joseph P. Lucia, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, was on brief, for appellee Timothy P. Alben.

January 19, 2021

**THOMPSON**, **Circuit Judge**.    The case we now confront presents a sad and recurring scenario, one we see play out on the national stage all too often.  While the facts among these cases may differ in varying degrees, the legal outcome is often the same:  enter stage right, the legal principles of supervisory liability, failure to train, and yes, unsurprisingly, qualified immunity,[1] too.

On June 14, 2013, Massachusetts State Trooper Stephen Walker ("Walker") pepper-sprayed, shot, and killed Wilfredo Justiniano, Jr. on the side of a highway.  Damaris Justiniano,[2] Justiniano's sister and the personal representative of his estate, brought a wrongful death and civil rights suit against both Walker and the Superintendent of the Massachusetts State Police, Colonel Timothy Alben ("Alben"), alleging that Walker used excessive force against Justiniano in violation of his constitutional rights, and that Alben should be brought to bear for that violation as well via supervisory liability (specifically, failure to train).  The district court dismissed the claims against Alben for failure to state a claim, and later, the magistrate judge granted summary

---

[1]  See Jamison v. McClendon, 2020 WL 4497723, at *1-2 (S.D. Miss. Aug. 4, 2020) (collecting qualified immunity cases).

[2]  For ease of exposition, we will refer to Damaris Justiniano, as personal representative, and Wilfredo Justiniano, Jr. each as "Justiniano."

judgment for Walker based on the qualified immunity doctrine.[3] Justiniano appealed.

In the wake of the oral argument we heard on that appeal, a new issue bubbled up:  Justiniano's motion to vacate the summary-judgment grant based on newly discovered evidence that, in Justiniano's view, further supported the argument that summary judgment for Walker was inappropriate and he was not entitled to qualified immunity.  The magistrate judge declined Justiniano's invitation to set aside the judgment, and Justiniano appealed that, too.

Having scoured the record and carefully reviewed the issues in this consolidated appeal, we affirm each of the lower court's judgments.

## BACKGROUND

We start with the facts, which we present in the light most favorable to Justiniano; as we do so, we draw all supportable inferences in his favor.  See, e.g., Rivera-Corraliza v. Morales, 794 F.3d 208, 210 (1st Cir. 2015) (citing Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 2, 5 (1st Cir. 2012)).  We'll first recount the

---

[3]  As a heads-up, note that the district court judge entered judgment on the motion to dismiss and the magistrate judge -- who, by agreement of the parties and in accordance with 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil Procedure, thereafter handled the case on his own -- entered judgment on the summary-judgment motion, as well as the subsequent motion to vacate that judgment.

facts of the incident itself -- the unfortunate turn of events that sparked this litigation in the first place -- before shifting to all of the procedural history. As is usually the case in the summary-judgment context, the parties dispute a number of facts, particularly those regarding what happened after Walker encountered Justiniano on the side of the highway. But what brought Walker to the scene is undisputed, and that's where we begin.

On that morning in June 2013, Justiniano, a forty-one-year-old Hispanic man who had been diagnosed with paranoid schizophrenia, was driving north on Route 28 near the Milton/Quincy line in Massachusetts. A driver behind him, Karen Kyriakides ("Kyriakides"), noticed that he was driving erratically. When Justiniano pulled over, Kyriakides (a good Samaritan indeed) stopped as well and, concerned about Justiniano's well-being, went over to his car to check on him. Noticing that Justiniano was out of sorts -- confused, distraught, and not speaking intelligibly -- she returned to her car and called 911. The record does not include a transcript of the 911 call, but Kyriakides remembers telling the dispatcher a man "needed help" but she "didn't know what was going on with [him], so they needed to come out and see what was going on." Kyriakides indicated that, because of Justiniano's erratic behavior, she was scared for Justiniano, herself, and anyone else driving by.

Meanwhile, at the nearby state police barracks in Milton, Walker's 7:00 a.m. day shift was getting underway when Kyriakides' 911 call came in. The desk officer who took the call told Walker about "a possible medical emergency" on Route 28; around 8:00 a.m., Walker set out for the scene. When Walker arrived, he saw Justiniano standing near his car. Walker radioed for backup, then parked behind Justiniano's car and left his emergency lights flashing before exiting his vehicle to see what was going on.

The details of what followed are hotly contested.

According to Walker, Justiniano told Walker that he (Justiniano) was an undercover cop and Walker was going to have to kill Justiniano.[4] Justiniano, moving toward Walker, next told Walker that if Walker didn't kill him (Justiniano), he would kill Walker -- and he repeated this throughout the encounter. At various points during their standoff, Walker attempted to calm Justiniano down verbally and through gestures. Three civilian witnesses on or near the scene -- Kyriakides, Jo-Ann Silva-Winbush, and Shannon MacKeen -- testified that they saw Walker using hand gestures meant to stop Justiniano from moving towards Walker and/or to calm Justiniano down; none of the witnesses indicated that Justiniano complied. Throughout this part of their encounter,

---

[4] None of the other witnesses could hear what was being said by Justiniano or Walker.

Walker and Justiniano stood about fourteen to twenty feet apart from one another. Walker says Justiniano, while approaching Walker, was holding a ballpoint pen much like someone would hold a knife, still talking about killing Walker.[5] In response, Walker began to retreat -- Kyriakides testified she saw Walker taking steps backward toward the highway; Silva-Winbush said Walker "jumped in front of her car" so she came to a stop, then watched him back up into the road further. Walker also told Justiniano to stop advancing toward him. Silva-Winbush explained that Justiniano was "coming after" or "lunging for" Walker at this point, and Walker "put his hand up" to indicate "stop" and "[s]tay there" to Justiniano with his hand palm-out towards Justiniano. Kyriakides testified that she saw Justiniano "getting closer to the trooper," and "look[ing] like he was ready to jump on [Walker]" and, eventually, "lung[ing]" at him.

Asserting that "it was immediately apparent that Wilfredo Justiniano was having a mental health crisis," Justiniano urges a different version of these events, disputing in particular that Justiniano was holding a pen and threatening to kill Walker. Specifically, Justiniano highlights that Silva-Winbush and MacKeen stated they could not see anything in Justiniano's hands, while Kyriakides said she noticed Justiniano placed an object (she didn't

---

[5] No other witness testified to seeing Justiniano holding a pen (though a pen was found at the scene).

- 7 -

see what it was) on the ground before Walker arrived, and, when he moved towards Walker, it was with his arms out and palms open. As for the threats Walker said Justiniano made, Justiniano asserts that the idea that Justiniano was uttering comprehensible communications does not jibe with Kyriakides' testimony that, when she spoke with Justiniano moments before Walker's arrival, he was not speaking an intelligible language.

In any event, whether Justiniano was unarmed and speaking incoherently, or wielding a pen like a knife and threatening Walker, it is undisputed that Justiniano kept moving forward (though the nature of this precise movement is very debated, as we'll discuss later), so Walker, keeping a distance of about fourteen feet between them, next resorted to his pepper spray, spraying Justiniano twice in the face. Kyriakides explained that Walker appeared to spray Justiniano after Justiniano lunged at him, but she didn't actually see either spraying take place. Silva-Winbush, however, did see Walker spray Justiniano, and observed that neither spraying seemed to "bother [Justiniano]," who "shook it off."

According to Walker, the wind blew some of the second spray back into Walker's eyes, compromising his vision. After being sprayed that second time, Justiniano moved towards Walker and closed the distance between them. Kyriakides testified that Justiniano was "charg[ing] at" Walker, and Silva-Winbush testified

- 8 -

that Justiniano "came after" Walker at that point, "really mad" and "ready to fight," despite Walker again holding up his hand, gesturing for Justiniano to stop, and continuing to back up into the highway.

As best we can tell from the excerpts of her deposition in the record, MacKeen was driving by the scene around this time, "stopp[ing] a little bit when [she] realized what was going on." She noted seeing Walker's hand on his gun and Justiniano dipping his shoulder, leading to Walker "pull[ing] the weapon" -- the weapon being his gun, which she saw, before driving away; then she heard the shot. She explained that, while they'd been "basically stationary" when she first saw Walker and Justiniano, Justiniano was swaying and pacing before taking some steps towards Walker, then dipping his shoulder down "like he might attack" Walker. MacKeen also indicated that Walker had put his hands in front of him, gesturing "to make [Justiniano] stand down, stop moving[,]" and Walker took "one big step back" before Justiniano had dipped his shoulder. At no point does MacKeen mention pepper spray.

When Justiniano was about four to seven feet away from Walker, Walker unholstered his firearm and fired two shots from his hip. One shot hit Justiniano in his left forearm, the other in his chest. Walker says that Justiniano, after being shot, tried to get up, so Walker pushed him back to the ground with his foot. A backup officer, (Joseph Durning) arrived, and he and Walker

struggled to handcuff Justiniano; Durning, concerned Justiniano might have a weapon, pepper-sprayed Justiniano. Eventually, Walker, Durning, other officers, and firefighters were able to subdue and handcuff Justiniano, who was then placed on a stretcher. From there, he was transported to Milton Hospital, where he was later pronounced dead.

On April 14, 2015, Justiniano filed suit against Walker and Alben in the United States District Court for the District of Massachusetts.[6] Relevant to this appeal, under 42 U.S.C. § 1983, the complaint alleged that Walker's actions violated Justiniano's right to be free from excessive force (Count 1), and that Alben, as Walker's supervisor, was deliberately indifferent in failing to train Massachusetts State Troopers on how to interact with mentally ill individuals (thus, he alleged, putting Alben on the liability hook for Walker's actions) (Count 3).[7] More on the details of

---

[6] The complaint alleged four counts, but, on appeal, Justiniano is pursuing the dismissal of Counts 1 and 3 only. The curious reader can note that the counts not being chased down in today's appeal were wrongful death claims against Walker (Count 2) and Alben (Count 4).

[7] Quick pause to observe that both the complaint and summary-judgment phase focused on the shooting as the excessive force, but in the motion to vacate (which we'll discuss in a bit) and now before us on appeal, Justiniano switched gears and advances the first use of the pepper spray as the excessive force. It's unclear why. Because of the analytical route we'll be taking on our way to resolving this case, we can assume (without deciding) that this switch-up does not constitute waiver. Thus it is not necessary for us to comment or consider this further.

these allegations down the line.

As we already previewed, these claims were dismissed, albeit at different stages of the litigation timeline. First, on September 22, 2016, the district court, adopting a magistrate judge's report and recommendation ("R&R") over Justiniano's objection, dismissed the claim against Alben -- regardless of whether Walker's actions may have violated Justiniano's rights -- because Justiniano had not plausibly alleged deliberate indifference or causation.

The claims against Walker cleared the pleadings-stage hurdle, but stumbled when Walker moved for summary judgment on the ground that he acted reasonably and, regardless, was entitled to qualified immunity. Indeed, in September 2018, the magistrate judge entered an order granting summary judgment in favor of Walker on the ground that his actions were not a constitutional violation as a matter of law. Taking a belt-and-suspenders approach, the magistrate judge went on to say that even if Walker had committed a constitutional violation, summary judgment still was proper because he would be entitled to qualified immunity. Justiniano appealed both dispositions of his case.

That appeal was argued before this panel in July 2019. Soon thereafter, in late September, a new dimension to the case developed when, in connection with a separate but related matter pending in Massachusetts state court, Justiniano discovered new

evidence (specifically, evidence from Walker's personnel file that Justiniano says demonstrates Walker's propensity to be untruthful when disciplinary action arising from his incidents of misconduct is on the line -- more detail to follow) that prompted Justiniano to ask the magistrate judge to vacate the dismissal of the case against Walker.[8]  The magistrate judge denied the motion, explaining that Justiniano could (and should) have obtained the at-issue evidence in the first instance by exercising the due diligence required under Rule 60(b)(2) of the Federal Rules of Civil Procedure; but even if that was not so, the new evidence still would not have changed the magistrate judge's take on the motion for summary judgment.  Justiniano again appealed.  That appeal, consolidated with the original appeal, was argued to us on September 10, 2020.

This brings us up to date, up to speed, and ready to tackle our analysis.

---

[8] Actually, the procedural history is a touch more labored: Justiniano moved pursuant to Rule 60 of the Federal Rules of Civil Procedure to have the magistrate judge set aside the judgment based on the newly discovered evidence, and the magistrate judge denied that motion for lack of jurisdiction.  That ruling was appealed and ultimately vacated by an order of this court instructing that the Rule 60 motion be construed as a motion under Rule 62.1 instead.  See Fed. R. Civ. P. 62.1(a) (directing that, "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may" do one of these things:  "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue").

**DISCUSSION**

We begin making our way through the issues presented by reviewing the dismissal of the claim against Alben, then we'll pivot to our discussion of the interwoven questions centering on the denial of Justiniano's motion to vacate and the summary disposition of the claim against Walker.

### A. Alben and the Motion to Dismiss

As always, "we give de novo review to a Rule 12(b)(6) failure to state a claim dismissal, using the same criteria as the district judge." Zell v. Ricci, 957 F.3d 1, 7 (1st Cir. 2020) (alterations omitted) (citations omitted). Recall, too, that "we take as true the allegations of the complaint, as well as any inferences we can draw from them in [Justiniano]'s favor." Id. (citing Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011)). As we assess the adequacy of a complaint, we are mindful that

> our circuit has instructed that the review should be handled like this: first, "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements[,]" then "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief."

!
Id. (quoting Zenon v. Guzman, 924 F.3d 611, 615–16 (1st Cir. 2019)); see also Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (discussing, among other cases,

- 13 -

*Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels us to draw on our judicial experience and common sense." *Zell*, 957 F.3d at 7 (internal quotations omitted) (quoting *Schatz*, 669 F.3d at 55). The plausibility standard is not a "probability requirement," but instead "asks for more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678 -- so if we can't infer from the well-pleaded facts "more than the mere possibility of misconduct," *id.* at 679, then the complaint has not shown "that the pleader is entitled to relief," *id.* (quoting Fed. R. Civ. P. 8(a)(2)).

We start off by noting that Alben argued -- to the district court and before us -- a qualified immunity defense. However, we will not dive head first into that argument because, even if we were to assume that he was not entitled to such immunity, we would still affirm the dismissal of the count against him. *See* *Camilo-Robles* v. *Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (advising courts to separate the "qualified immunity" analysis from the "merits" supervisory liability analysis "whenever practicable" because each inquiry is "distinct").

At the heart of the Alben motion-to-dismiss issue then is whether the complaint's Count 3 plausibly alleged not only that

- 14 -

Alben's failure to implement training to teach troopers how to deal with mentally ill individuals caused a violation of Justiniano's constitutional rights, but also that Alben was deliberately indifferent to the risk that not providing that training would result in a trooper committing that kind of constitutional violation. Justiniano, of course, says the complaint accomplished all of this, while Alben takes the opposite stance. Before we get into those arguments, let's first canvass these legal principles (deliberate indifference, causation in failure-to-train cases) -- they're the backdrop against which we'll assess the complaint's sufficiency, after all.

Alben was not on the scene, of course, so Justiniano relies on supervisory liability and a failure-to-train theory to put him on the hook. We've cautioned that "[t]he liability criteria for 'failure to train' claims are exceptionally stringent." Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998) (citations omitted). Generally, a supervisor cannot be held liable under § 1983 on a respondeat superior theory -- a "supervisor's liability must be premised on his [or her] own acts or omissions" and does not attach automatically even if a subordinate is found liable. Guadalupe-Báez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016). To connect the liability dots successfully between supervisor and subordinate in this context, a plaintiff must show "that one of the supervisor's subordinates abridged the

- 15 -

plaintiff's constitutional rights" and that the supervisor's (in)action "was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as . . . gross negligence amounting to deliberate indifference."[9] Id. at 514-15 (alterations omitted) (first citing then quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)). And that's a critical issue here -- deliberate indifference. Deliberate indifference requires a plaintiff to demonstrate or allege "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." Camilo-Robles, 151 F.3d at 7; see also Guadalupe-Báez, 819 F.3d at 515. Indeed, "[m]ere negligence will not suffice: the supervisor's conduct must evince 'reckless or callous indifference

---

[9] A brief aside: as will become apparent, because we can resolve the appellate contentions on other requisite components of the global legal claims advanced by Justiniano, we really don't need to determine whether Walker's conduct constituted a violation of Justiniano's constitutional rights. This is true later, too, when we tackle the Walker-summary-judgment issue. We take this approach not only because when "it is not necessary to decide more, it is necessary not to decide more," Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 27 (1st Cir. 2016) (quoting PDK Labs., Inc. v. Drug Enf't Admin., 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)), but also because of the added wrinkle that the constitutional violation pled in the complaint (the shooting) differs from the constitutional violation argued in the Walker issue on appeal (the pepper-spraying).

At any rate, in this section of analysis, as we're about to explain, we can do away with the arguments based on failure to plausibly plead deliberate indifference and causation, so we can assume (certainly without deciding) a constitutional violation transpired.

to the constitutional rights of others.'" Guadalupe-Báez, 819 F.3d at 515 (quoting Febus-Rodríguez v. Betancourt-Lebrón, 14 F.3d 87, 92 (1st Cir. 1994)).

And there's more. "[D]eliberate indifference alone does not equate with supervisory liability," id. (quoting Figueroa-Torres v. Toledo-Dávila, 232 F.3d 270, 279 (1st Cir. 2000) (alteration in original)), but rather "[c]ausation [is also] an essential element, and the causal link between a supervisor's conduct and the constitutional violation must be solid," id. (citation omitted). For causation in a failure-to-train claim, a plaintiff must allege that the "lack of training caused [the officer] to take actions that were objectively unreasonable and constituted excessive force." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005). And the causation requirement "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." Guadalupe-Báez, 819 F.3d at 515 (quoting Hegarty v. Somerset Cty., 53 F.3d 1367, 1380 (1st Cir. 1995)). We've observed this "is a difficult standard to meet," though not impossible -- for instance, a plaintiff could "prove causation by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" Id. (quoting Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 582 (1st Cir. 1994)). Alternatively, liability might be appropriate "'in a narrow range of

- 17 -

circumstances' where 'a violation . . .' is 'a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" <u>Young</u>, 404 F.3d at 28 (quoting <u>Bd. Of Cty. Comm'rs. of Bryan Cty., Okla.</u> v. <u>Brown</u>, 520 U.S. 397, 409 (1997)).

So that's what needed to be alleged here -- deliberate indifference and causation that fit these black-letter-law bills. True, "[c]ausation and deliberate indifference are separate requirements . . . [, but] they are often intertwined in these cases." <u>Id.</u> at 26. So it is here -- both determinations turn on whether Alben was aware of a risk that his subordinates (Walker, in particular) might violate mentally ill individuals' constitutional rights.

Justiniano says the complaint does plenty to state this claim plausibly, and thus it should have survived the Rule 12(b)(6) motion. Count 3 alleges that Alben, as Walker's supervisor and a policymaker, failed to provide Walker with the proper training and resources that would have helped to prevent a violation of Justiniano's constitutional rights (again, the complaint leans on the lethal force as the violation). Justiniano argues that the complaint adequately alleges that Alben was aware of and ignored national trends indicating a problematic rise in bad-outcome encounters between police and mentally ill individuals but provided no specialized training, and that failure to train

constituted deliberate indifference to an obvious risk. And, according to Justiniano, the complaint plausibly lays out the requisite causal nexus by alleging that the sought-after de-escalation training would have prevented this tragedy, meaning Walker's lack of training by Alben was the cause of the violation of Justiniano's rights.

Alben disagrees, asserting that the complaint falls short of alleging facts sufficient to establish that he acted with deliberate indifference to Justiniano's constitutional rights (or, put differently, that Alben had notice of conduct violating constitutional rights but failed to take steps to address it), and, on top of that, the complaint does not adequately allege that proper training would have prevented that violation (i.e., no causation).

With the benefit of every possible doubt -- accepting all of the complaint's factual allegations as true, Zell, 957 F.3d at 7, assuming that a constitutional violation occurred, drawing all reasonable inferences in Justiniano's favor, and "isolat[ing] and ignor[ing]" mere legal conclusions -- this claim's "non-conclusory, non-speculative" factual allegations do not "plausibly narrate a claim for relief," id. (quoting Zenon, 924 F.3d at 615-16), so Justiniano's Count 3 as pled does not pass muster.

In broad strokes, as to the alleged facts that arguably could support the supervisory liability theory, this is what the

- 19 -

complaint does accomplish:  that Alben, as supervisor, did not have specific policies in place "for dealing with mental health crises without using lethal force" or "for troopers dealing with mental health crises on techniques to de-escalate"; that Alben was aware of national trends showing an increase in the number of mental health crises and a corresponding increase in the number of death-resulting encounters with police which have prompted some law enforcement entities to institute training regarding these issues, but Alben took no "affirmative action," which may have contributed to Justiniano's death.  It then asserts that Alben's failure to act in the face of these national trends "demonstrates a deliberate indifference" to Justiniano's civil rights, and, "[a]s a direct result of" Alben's conduct, Justiniano died.

It is not difficult to see what Justiniano was trying to do here.  But these alleged facts don't support the essential legal elements of "reckless or callous indifference to the constitutional rights of others," Guadalupe-Báez, 819 F.3d at 515 (quoting Febus-Rodríguez, 14 F.3d at 92), and the "solid" "causal link between [Alben]'s conduct and the constitutional violation," id. (citation omitted), that Justiniano needed to state in order to be entitled to relief as a matter of law.

Starting with deliberate indifference, it's clear Justiniano's aim was to highlight the absence of training when it comes to police encounters with the mentally ill -- Alben himself

acknowledged that shortcoming in the system, as the complaint alleges -- and to try to link that to wrongdoing by Alben. But there are too many pieces missing, even with the benefit of some inferential leaps, for us to conclude deliberate indifference has been plausibly pled.

For instance, there are no non-speculative facts in the complaint that allege a specific "grave risk of harm" in failing to train or that there were "easily available measures to address the risk" that Alben could have taken but didn't. Camilo-Robles, 151 F.3d at 7; see also Guadalupe-Báez, 819 F.3d at 515. There is no allegation that the referenced mental health training adopted by some other jurisdictions would have been easy to implement in Massachusetts, nor that the trainings actually have been effective in reducing the frequency of constitutional violations of the mentally ill. See, e.g., Rodriques v. Furtado, 950 F.2d 805, 813 (1st Cir. 1991) (explaining that arguable weaknesses with respect to police training or supervision don't necessarily equate to deliberate-indifference failure to train). And even if there were such allegations, it still would not be enough to suggest plausibly that Alben knew or should have known his troopers might violate the rights of a mentally ill individual, particularly when there is no known history of such constitutional trampling by Massachusetts troopers alleged. The complaint does not plead that Walker or the Massachusetts State Police more generally had a

history of using excessive and constitutionally violative force against individuals who were mentally ill such that Alben should have been on notice of that conduct, nor is there any suggestion that the Massachusetts State Police are otherwise specifically at risk of violating a mentally ill individual's constitutional rights.  See Guadalupe-Báez, 819 F.3d at 516.  Clearly, then, he could not have ignored -- with deliberate indifference or otherwise -- a non-existent history of these issues.[10]

Another angle would be to consider whether the complaint plausibly alleged a national trend of constitutional violations so prominent that Alben should have been (or was) on notice of a high

_____

[10]    On the deliberate indifference/notice front, by comparison, consider the facts and outcome in Guadalupe-Báez:  a man was shot, and although he was not able to identify his shooter, he had reason to believe it was a local police officer.  819 F.3d at 513.  The supervisory failure alleged there centered on a lackluster police investigation into the matter.  Id. at 516.  In concluding the plaintiff barely met the pleading standard, a panel of this court put emphasis on the particular police force's "tarnished history" of civil rights violations and a Department of Justice report calling out that specific police force's issues.  Id. at 512.  And then there's Young, in which a friendly-fire incident saw on-duty uniformed officers shoot an off-duty officer who was responding to the same incident.  404 F.3d at 9.  The Young court found supervisory liability despite the absence of a history of past violations because the police department's policy required off-duty officers to remain armed and respond to situations they encountered.  Id.  Because officials made statements suggesting they were aware of a high risk of a friendly-fire incident in these circumstances, and because the police force's training did not necessarily prepare on-duty officers for the inherently dangerous possibility of an armed and responding off-duty officer, the court explained that a jury could have found the officers to have been deliberately indifferent to a risk of this shooting.  Id. at 18-19, 28.

risk that, without this training, there was a grave risk that his troopers would violate a mentally ill person's constitutional rights, and he nonetheless ignored it. See Young, 404 F.3d at 28. But the complaint does not allege such a widespread, prominent trend of constitutional violations: in fact, the complaint does not actually allege that the "trend" involves constitutional violations at all, but instead states that there are more and more "tragic encounters with police where unarmed mentally ill citizens end up dead." While we do not purport to foreclose the possibility that such a national trend might be enough to provide this notice, the trend as alleged here simply does not rise to that level.

And the requisite causal link has not been plausibly alleged either, i.e., that Alben's failure to train his troopers "caused [Walker] to take actions that were objectively unreasonable and constituted excessive force." Young, 404 F.3d at 27. Justiniano pleads that "[a]s a direct result of the conduct of Defendant Alben, Wilfredo Justiniano lost his life," but none of the pled conduct supports that legal conclusion. And while the complaint alleges that Walker acted improperly in light of Justiniano's mental condition, there is no allegation that Walker's decision to shoot Justiniano was related to any mental illness that Justiniano suffered. Yes, the complaint alleges that Walker confronted, fired his gun at, and ultimately killed Justiniano, who was unarmed and experiencing a mental health

- 23 -

crisis, but, even if all of that was proven, there still could be no non-speculative inference from those facts that, had Alben provided the training, the shooting would not have happened.

Recall, too, that we've said a plaintiff could "prove causation [in this context] by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations,'" Guadalupe-Báez, 819 F.3d at 515 (quoting Maldonado-Denis, 23 F.3d at 582), and it could be alleged by pleading that certain conduct "is 'a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations,'" Young, 404 F.3d at 28 (quoting Brown, 520 U.S. at 409). This is a non-exhaustive set of examples, certainly, but nothing even approaching these scenarios happened here (as we touched on in part in our deliberate indifference discussion). Instead, the complaint conclusorily alleges that Alben's refusal to change the relevant policies led to the "inevitable outcome" of Justiniano's death, but does nothing to allege non-speculative facts that would allow an inference that training actually would have altered that outcome.

All told, we needed "more than a sheer possibility that [Alben] . . . acted unlawfully[,]" but we didn't get it. Iqbal, 556 U.S. at 678. There's not enough factually alleged here to support a conclusion that Alben acted with deliberate indifference when he neglected to train Walker (and other troopers) on how to

interact with the mentally ill; and, regardless of that shortcoming, there's still a dearth of factual allegations to bolster the conclusion that his failure to do so caused Walker to violate Justiniano's rights.  Therefore, we affirm the district court's dismissal of the claim against Alben.

### B. Walker and the Motion for Summary Judgment

We thus move on, turning our gaze to the summary judgment granted to Walker and ensuing new-evidence litigation.  Here's how that will go:  we'll first explain everything that happened below -- the summary-judgment grant as to Count 1 followed by the denial of the motion to vacate -- then lay out the rules of engagement for qualified-immunity arguments before turning to the parties' appellate contentions, all of which we'll assess under de novo review because, as we'll explain, even if we look at all the evidence (both old and new), a de novo review of the entire matter still leads to an affirmance based on qualified immunity.  Let's begin.

### i.  Proceedings Below

Starting with Walker's motion for summary judgment, here's the gist of how this issue went below.

Walker moved for summary judgment on the ground that he did not violate Justiniano's rights and, in any event, was entitled to qualified immunity.  In opposition, Justiniano argued there were genuine issues of material fact (focusing in particular on

whether Justiniano was wielding a weapon (the pen); what, exactly, was said between Walker and Justiniano; and, overall, whether Walker could have reasonably felt threatened) and that qualified immunity should not attach because Walker's conduct constituted an unconstitutional and unreasonable use of excessive force that violated a protected right that was clearly established at the time, especially given that Justiniano "posed no imminent threat." In fielding that motion, the magistrate judge considered the evidence, including evidence from civilian witnesses and evidence from Walker that Justiniano was brandishing a ballpoint pen as a weapon and made threatening statements to Walker.[11] Justiniano v. Walker, 2018 WL 4696741, at *2-3 (D. Mass. Sept. 30, 2018). In finding that, based on the entire record, Walker acted reasonably under the circumstances, the magistrate judge concluded that Walker therefore did not use excessive force. Id. at *5. And, moreover, even if Walker's conduct had constituted excessive force, the magistrate judge indicated that Walker would be protected by the cover of qualified immunity because "a reasonable officer would not have clearly understood Trooper Walker's conduct to be unreasonable" since Justiniano "posed an imminent threat" -- indeed, that reasonable officer "would not have readily

_____

[11] Recall from our earlier factual recitation that no witness could hear anything being said by either Justiniano or Walker, nor could any witness confirm that Justiniano was holding a pen in this manner (though a pen was found on the road after the fact).

understood Trooper Walker's actions to violate Justiniano's rights." Id. at *6. The court accordingly granted the motion for summary judgment. Id.!

As discussed, that ruling was appealed, and while the appeal was pending, the new-evidence issue materialized. Here's what the new evidence was and how it came to light. In the parallel litigation taking place in the Massachusetts state court, Justiniano's motion to compel production of certain documents (which had been requested but not been produced in the federal case) was granted, providing access to some of Walker's personnel file, including disciplinary reports regarding Walker, training reports, and some emails. Justiniano v. Walker, 2019 WL 7169785, at *1-2, *4 (D. Mass. Dec. 24, 2019). Justiniano says this evidence matters because it demonstrates Walker's history of lying while under investigation in two prior misconduct matters, that he (a) violated department policy when he failed to create a use of force report within the required 24-hour period after Justiniano's shooting, and (b) lied under oath in his deposition in this matter when he represented that he had written the report when, according to the State Police producing the compelled documents, no such report could be found.[12] In view of this new evidence showing

---

[12] Obviously, to the extent this was indeed a lie under oath as Justiniano asserts, we do not condone perjury. But, as we'll explain, we do not need to get into whether that is what happened.

(according to Justiniano) that Walker has a spotty history when it comes to truth-telling, Justiniano argued the summary-judgment grant should be vacated because Walker's uncorroborated statements regarding the incident with Justiniano are no longer credible, meaning there are genuine issues of material fact as to whether the incident transpired as Walker indicated and thus, whether he acted reasonably when he pepper-sprayed Justiniano.

Back before the lower court after our remand, the magistrate judge first concluded that, in view of our due-diligence Rule 60 caselaw, Justiniano should have done more to obtain this evidence in the instant litigation, i.e., pursue an order compelling production. Id. at *5-6. Then, in an exercise of even-if thoroughness, the magistrate judge went on to assume arguendo that, had the due-diligence hurdle been surmounted, the relief Justiniano sought (vacating the summary-judgment grant) still would not be granted because the new evidence wouldn't change the outcome: even removing Walker's uncorroborated statements from consideration, Walker was nonetheless entitled to qualified immunity. Id. at *6-7. The magistrate judge assessed the qualified-immunity issue -- minus Walker's statements -- and concluded that, on this record, Walker had not acted unreasonably:

> an objectively reasonable officer in Trooper Walker's position would not have understood that emitting a burst of pepper spray to retard Justiniano's movements violated his rights. On the contrary, the undisputed facts demonstrate that Justiniano appeared agitated and

distraught when Trooper Walker arrived, Trooper Walker tried to calm him down by holding up his hands, Justiniano did not comply, and Trooper Walker used the pepper spray only after he was forced to back up into [the highway].

Id. at *7.[13]

### ii.  Ground Rules:  Qualified-Immunity Law

We need not grapple with the front-end issue of whether the new evidence should have been discovered in this action with the exercise of due diligence because, even if it had been, its existence in this record does not alter the outcome:  Walker is still protected by qualified immunity.  We thus proceed under the assumption that the new evidence can be considered, meaning we take Walker's uncorroborated statements off the evidentiary table as we analyze the qualified-immunity question here.

We begin with a primer on the standard of review, the qualified-immunity test, and the guidance our caselaw provides.

We review a grant of summary judgment de novo, drawing all reasonable inferences in the light most favorable to the nonmoving party.  Mitchell v. Miller, 790 F.3d 73, 76 (1st Cir. 2015) (citing Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).  Our caselaw and Rule 56 of the Federal Rules of Civil Procedure teach us to affirm the grant of summary judgment only if

---

[13]  Recall that, as we mentioned a few pages back, Justiniano's appellate focus is on the pepper spraying only, not the lethal force.

"there is no genuine dispute as to any material fact" and, as a result, the moving party is "entitled to judgment as a matter of law." Id. at 76-77 (quoting Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 10 (1st Cir. 2013)); see also Fed. R. Civ. P. 56(a). Importantly, to avoid "the swing of the summary judgment scythe," the nonmoving party must adduce specific facts showing that a trier of fact could reasonably find in his favor, Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003), the nonmovant cannot rely on "conclusory allegations, improbable inferences, and unsupported speculation," Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

This lens of review in place, we turn to qualified immunity -- much referenced thus far, but not yet subject to a deep-dive, so in we go. "Qualified immunity protects an officer from suit when a reasonable decision in the line of duty ends up being a bad guess -- in other words, it shields from liability 'all but the plainly incompetent or those who knowingly violate the law.'" Decker, 845 F.3d at 22 (quoting Taylor v. Barkes, 575 U.S. 822, 822 (2015)). "'[R]easonable mistakes,' the Supreme Court tells us, 'can be made as to the legal constraints' on officers, and when that happens, the officer is qualifiedly immune from damages." Id. (alteration in original) (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009)). Here, to quash Walker's qualified-

immunity defense, Justiniano needed to "show (1) that [Walker] infracted [Justiniano's] federal rights and (2) that these rights were so clearly established that a reasonable officer should have known how they applied to the situation at hand." Id. at 23 (citing City & Cnty. of S.F. v. Sheehan, 575 U.S. 600 (2015); Pearson, 555 U.S. at 232; Cortés-Reyes v. Salas-Quintana, 608 F.3d 41, 51-52 (1st Cir. 2010)). In fact, we routinely break the second prong down even more explicitly as follows: "'whether the right was clearly established at the time of the alleged violation,' and 'whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right.'" Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008) (quoting Philip v. Cronin, 537 F.3d 26, 34 (1st Cir. 2008) (reasoning that, even if a constitutional right has been clearly established, a defendant may nonetheless be protected by qualified immunity if a reasonable official in the defendant's position could have believed (even wrongly) that the at-issue conduct was not violative of a constitutional right)); see also Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003) (en banc) (referring to the qualified-immunity test as a "three-part algorithm"). And breaking the clearly-established element down in this way makes good sense: "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes

- 31 -

would have understood that he was violating it," <u>Plumhoff</u> v. <u>Rickard</u>, 572 U.S. 765, 778-79 (2014), i.e., "'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate,'" <u>id.</u> at 779 (quoting <u>Ashcroft</u> v. <u>al-Kidd</u>, 563 U.S. 731, 741 (2011)).

We can tackle these components of the qualified-immunity test in any order we like. <u>Pearson</u>, 555 U.S. at 236. Here, we'll assume without deciding the first pieces have been shown -- Walker's use of the pepper spray violated Justiniano's right to be free from that force, and that right was clearly established and on the books in June 2013 -- and resolve the matter on the question of whether a reasonable, similarly situated officer would understand that Walker's conduct violated Justiniano's constitutional right.[14] See <u>Parker</u>, 547 F.3d at 12-13. As we do so, we keep in mind that, because "[c]ourts penalize officers for violating bright lines, not for making bad guesses in gray areas," <u>Rivera-Corraliza</u>, 794 F.3d at 215 (internal quotation marks omitted), if the pertinent "legal principles are clearly established only at a level of generality so high that officials cannot fairly anticipate the legal consequences of specific

---

[14] Because we will dispose of the matter in this way, we need not get into the constitutionality of Walker's conduct. <u>See</u> <u>Decker</u>, 845 F.3d at 23 n.8 (taking a similar approach in a qualified immunity matter); <u>Barton</u> v. <u>Clancy</u>, 632 F.3d 9, 12, 30 n.20 (1st Cir. 2011) (same). Remember, this is what we did in the Alben analysis, as well.

actions, then the requisite notice is lacking," Savard, 338 F.3d at 28.

We are also mindful that deciding qualified immunity at the summary-judgment stage can be tricky. See Morelli v. Webster, 552 F.3d 12, 18-19 (1st Cir. 2009) (discussing the "inherent tension" between qualified immunity and summary judgment). Yes, "qualified immunity is 'an immunity from suit rather than a mere defense to liability,'" meaning "'it is effectively lost if a case is erroneously permitted to go to trial,'" Pearson, 555 U.S. at 231 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)), so qualified immunity's applicability "should be resolved at the earliest possible stage of litigation," Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013) (citing Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009)). But, as we've observed, "[t]he doctrinal intersection of qualified immunity principles and summary judgment principles is not well mapped," and "[p]lotting that intersection can present thorny analytic problems -- problems that are magnified because of the desire to resolve claims of qualified immunity at the earliest practicable stage of litigation." Morelli, 552 F.3d at 18 (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)). Furthermore, in qualified-immunity summary-judgment cases, it's a tug-of-war, really, between who gets the benefit of the doubt: summary judgment "requires absolute deference to the nonmovant's factual

assertions," while qualified immunity "demands deference to the reasonable, if mistaken, actions of the movant." Id. at 18-19.

We aim to resolve all of this tension by framing the factual events according to summary judgment's traditional leeway to the nonmoving party's version of events, and then asking whether, given that story, "a reasonable officer should have known that his actions were unlawful." Id. at 19.

### iii.  Walker is Qualifiedly Immune

Justiniano contends that the record contains enough conflicting testimony about material facts to raise a genuine dispute over whether Walker can be shielded by qualified immunity, i.e., whether Walker's use of pepper spray was an inappropriate and excessive use of force in violation of Justiniano's clearly established right to be free from that use of force.  And she argues that the new evidence in particular "leaves a universe of facts that support [her] claims":  no one but Walker saw Justiniano yelling in the road, heard any verbal threat by Justiniano, saw anything in Justiniano's hands, or heard Walker give Justiniano warnings about his intent to deploy force.  In Justiniano's view, since there's no witness who testifies that Justiniano was doing anything other than simply approaching Walker when the pepper spray was deployed, it is valid to infer the nature of his movement was nonthreatening, and thus it was not reasonable for Walker to use the spray.

Walker, in turn, argues that none of the facts to which Justiniano points lead to the conclusion that he is not shielded by qualified immunity, and this is so even if all of Walker's uncorroborated testimony is removed from consideration.

So now, as we leapfrog the initial elements of the qualified-immunity analysis (recall that we're assuming arguendo that the use of the pepper spray was unreasonable and Justiniano had a clearly established right to be free from that use of force), we confront the question of whether a reasonable officer in Walker's shoes would have understood Walker's conduct to violate Justiniano's constitutional right. See, e.g., Parker, 547 F.3d at 12.

Even viewing the facts in the light most favorable to Justiniano, removing from consideration any of Walker's uncorroborated testimony, and drawing all reasonable inferences in Justiniano's favor, the record here does not support a finding that a reasonable officer would have clearly understood Walker's conduct to be an unreasonable violation of Justiniano's rights.

Our careful review of the record here leaves us with these undisputed facts to sketch the contours of what happened. Kyriakides observed Justiniano driving erratically, and when they both pulled over, he was confused, distraught, and spoke unintelligibly. She was scared for Justiniano's wellbeing, as well as her own and that of passersby. After Walker hit the scene,

all three civilian witnesses (Kyriakides, Silva-Winbush, and MacKeen) observed Walker at various points trying to calm down and/or stop Justiniano from approaching him by using hand gestures. They also described Justiniano as appearing distraught, even mad; none observed Justiniano heeding Walker's hand gestures to calm down or stop his approach. Silva-Winbush, who witnessed each instance of pepper-spraying, indicated that the first use of the spray (the complained-of rights-violation here) came only after Walker had "jumped" into the highway as he continued to retreat from Justiniano. And each of these witnesses described various instances of Justiniano lunging or at least engaging in forward motion towards Walker.

From an objective standpoint, a reasonable officer could have believed Justiniano posed a threat, and thus that same reasonable officer, in Walker's position, would not have believed that the initial use of pepper spray (a generally non-lethal deployment) against Justiniano constituted a violation of Justiniano's rights. A contrary finding, even a contrary inference, is simply not supportable on the evidence here.

True, witnesses describe Justiniano's movements differently, and movement alone wouldn't necessarily justify the use of pepper spray. And yes, the key here is Justiniano's movements (or lack thereof, if that was the case) in the moments before and as the pepper spray was used -- Justiniano being

stationary, or approaching Walker in a decidedly nonaggressive fashion, for example, because that's what a jury could rely on to make inferences that Justiniano's behavior did not warrant the use of force he received because Walker couldn't have reasonably thought Justiniano posed a threat. But there is no witness testimony that Justiniano was stationary in the moment before the pepper spray was used; rather, all the evidence points to Justiniano steadily moving towards Walker in one fashion or another. Yes, MacKeen indicated both men were stationary when she first saw them, but for one thing, it's not entirely clear when exactly she observed this (as best we can tell, it's probably after the pepper-spraying went down, and just before the shooting -- either way, she doesn't say when Justiniano was stationary in relation to when the pepper spray was used), and for another, she said Justiniano did then approach Walker. And there's nothing that would support a reasonable inference that the nature of any of Justiniano's movements forward was anything other than aggressive if not downright threatening (even if Justiniano's behavior is sadly explained by his mental state). See, e.g., Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000) ("[A plaintiff] cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995))). Quite the

opposite: in the face of the evidence we do have about Justiniano's demeanor, reaching such a conclusion would require impermissible guesswork and speculation. Justiniano needed to point to specific facts that would allow a jury to find in her favor on this point, Mulvihill, 335 F.3d at 19, but we find ourselves left only with arguments requiring "improbable inferences[] and unsupported speculation" to reach the outcome she seeks, Medina-Muñoz, 896 F.2d at 8. Even framing the facts as favorably as we can according to Justiniano's version of events (no pen-as-weapon in the narrative, no threats issued to Walker by Justiniano), we cannot conclude on this record that a reasonable officer in Walker's position would have known his conduct (using the pepper spray) was unlawful under these circumstances. See, e.g., Morelli, 552 F.3d at 19. Accordingly, the magistrate judge was correct that Walker is entitled to qualified immunity.[15]

Therefore, we affirm the grant of summary judgment, and,

---

[15] Justiniano directs us to Gray v. Cummings, 917 F.3d 1 (1st Cir. 2019), another qualified-immunity case involving an encounter between a mentally ill individual and a law enforcement officer. The goal, it seems, was to argue that a person's mental illness must be considered when an officer decides to employ force against that individual. But the Gray court's conclusion was that a reasonable officer wouldn't have believed using a taser on the lowest stun setting to halt a nonviolent, mentally ill individual resisting arrest was a violation. Id. at 12. This does not undermine any of our analysis: a reasonable officer in Walker's shoes could have believed that the first use of pepper spray on Justiniano (who was behaving erratically, moving forward toward Walker and oncoming traffic on a highway and not known to Walker to be mentally ill) wasn't a constitutional violation.

for the same reasons, we affirm the denial of the Rule 60 motion to vacate.[16]

## WRAPPING UP

Before we go, we note that Justiniano also briefed an

---

[16] A housekeeping matter. Justiniano urges us to conclude that the magistrate judge abused his discretion when he refused to vacate his earlier summary-judgment grant. In so doing, Justiniano raises arguments under both sections (b)(2) and (b)(3) of Rule 60. Rule 60(b)(2), dealt with by the lower court because it was argued there, provides that a party can be relieved from a judgment like the one entered here if there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Rule 60(b)(3), raised for the first time on appeal, instructs that relief can be granted where there's "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." According to Justiniano, the magistrate judge abused his discretion in his handling of the Rule 60 motion for reasons falling under each of these two sections of that rule. But here's the thing: even taking as not waived the (b)(3) argument that fraud and misconduct by the Massachusetts State Police is what kept the evidence from being discovered in this action, these components of Rule 60(b) assume that the at-issue evidence was never discovered, accessed, or considered in ruling on the original dispositive motion the Rule 60(b) motion seeks to vacate -- and that's precisely why the rule exists, to remedy just such a plight. Here, we've already said (ad nauseum) that we assume favorably to Justiniano that the "newly discovered evidence" could be considered, and doing that had the effect of negating all of Walker's uncorroborated testimony. That's exactly the point that Justiniano wanted to make in arguing that the summary-judgment grant should not stand. But the thrust of Rule 60(b) as applied here is that the excluded or inaccessible evidence would need to change the outcome on the dispositive motion. We let it in, and it didn't alter the outcome of our qualified-immunity analysis. So we do not tarry any further on this because, with the outcome determined to be the same with or without the evidence, the magistrate judge did not abuse his discretion in fielding the Rule 60 motion as he did.

argument urging us to abandon the application of qualified immunity in cases resulting in death.  As we acknowledged at the outset of today's decision, we do not disagree that the issue of qualified immunity's role in our jurisprudence is topical, to say the least. But we are constrained by the precedent that led to today's outcome, and until that precedent changes, we are dutybound to apply it.

For the reasons explained in detail above, we **affirm** across the board the lower court's disposition of this case.  Each side to bear its own costs.